UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>    c/o United States Attorney's Office<br>    Judiciary Center Building<br>    555 4th Street, N.W.<br>    Washington, D.C. 20530,<br><br>        **Plaintiff,**<br><br>    v.<br><br>**ALL FUNDS SEIZED FROM OR ON DEPOSIT IN SUNTRUST ACCOUNT NUMBER xxxxxxxxx8359, IN THE NAME OF GOLD AND SILVER RESERVE, INC. AND ALL FUNDS ON DEPOSIT IN REGIONS BANK ACCOUNT NUMBER xxxxxx4851, IN THE NAME OF GOLD AND SILVER RESERVE, INC.**<br><br>        **Defendant.** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:  Civil Action No.<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully states as follows:

1.     This is a civil action, *in rem,* brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960.

2.     This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355(a). Venue is established by virtue of 28 U.S.C. §§ 1355(b)(1) and 1391(b).

3. The defendant funds are:

   a. All funds seized from or on deposit in SunTrust Bank account number xxxxxxxxx8359, in the name of Gold and Silver Reserve, Inc. ("SunTrust account"); and

   b. All funds seized from or on deposit in Regions Bank account number xxxxxx4851, in the name of Gold and Silver Reserve, Inc. ("Regions account").

4. On December 15, 2005, a seizure warrant was issued by this Court (J. Facciola), authorizing seizure by the United States Secret Service of all funds contained in these two accounts. The amount seized pursuant to the warrant from the SunTrust account was $135,912.32 and the amount seized from the Regions account was $590,306.59. The seized funds are currently in the custody of the United States Secret Service. An additional $89,405.55 has since been deposited into the Regions account, and both accounts are still able to receive deposits.

5. The two bank accounts listed above are owned and operated by Gold & Silver Reserve, Inc. doing business as OmniPay ("OmniPay"), which is a company that offers to exchange United States (and several other countries') currency into E-Gold, a private "digital" or "electronic" currency offered through the internet (www.e-gold.com) and purportedly backed by gold bullion. OmniPay provides three currency exchange services: (1) receiving national currency by wire for conversion into E-Gold; (2) converting E-Gold back into national currency (which may then be sent to the customer by wire transfer, check, or a bill paid to a third party on their behalf); and (3) conversion of E-Gold into another e-metal currency.

6. The term "electronic currency" has been adopted by Internet-based "sellers" of gold, silver, platinum, palladium, and other metals to describe the use of precious metals as a private currency for online payments. Issuers of electronic currencies promote the global acceptance of precious metals, observing that a buyer paying with gold does not have to worry about access to, or

acceptance of, underlying currencies. Merchants, online service providers, and individuals who are willing to receive payment in precious metals are allocated a quantity based on the day's market price. While taking delivery of the actual metal appears, technically, to be an option, recipients typically "sell" the metal through a digital currency exchanger and receive payment in a more conventional form by "cashing" out some portion of their digital currency accounts. Recipients can also transfer ownership of some or all of their precious metal holdings to someone else. This transfer of ownership of the underlying metal through the crediting and debiting of internet-based accounts is how online precious metal issuers facilitate payments on behalf of customers.

7. There are four primary steps involved in a financial transaction using a digital currency process (from the customer's perspective): (i) opening a digital currency account; (ii) converting national currency into a digital currency through an exchanger to fund the digital currency account; (iii) using value in the account to buy or sell a good or service; and (iv) exchanging value in the account back into national currency. Accordingly, digital currency issuers need two additional parties to complete these steps: (i) digital currency exchangers; and (ii) merchants that accept digital currencies for the payment of goods and services.

8. A person wishing to use a digital currency to purchase a good or service must first open an account with a digital currency issuer, which typically can be done online by providing only a valid email address. In order to fund a digital currency account, issuers typically require a customer to use the services of a third party digital currency exchanger. The exchangers generally operate independently from digital currency issuers. Exchangers provide services for customers wishing to engage in the buying, transferring, and selling of online precious metals. In particular, exchangers take national currency from customers and exchange it into a digital currency for purposes of funding, or increasing the value of, an existing digital currency account. By the same

token, exchangers also exchange the value in an account into national currency. Exchangers are typically the only method by which customers can obtain the value out of an account, short of taking possession of the precious metal itself. Each exchanger sets its own terms and conditions on the types and amounts of national currencies that will be accepted for exchange. Some only accept transfers from bank or credit card accounts. Others accept cash and money orders. Similarly, each exchange service offers different options for receiving funds. Some exchangers have physical locations, whereas others exist only virtually. There are many digital currency exchangers, including, OmniPay.

9. Gold & Silver Reserve, Inc. ("G&SR") d/b/a Omnipay, a Delaware Corporation incorporated on January 24,1996 as an E-Gold transnational monetary payment system, is a digital currency exchanger that offers currency exchange services for individuals wishing to purchase, transfer, and/or sell E-Gold. The principle officers are Douglas Jackson, President, Reid Jackson, Director, and Barry Downey, Secretary. The business address of OmniPay is 175 E. Nasa Blvd., Suite 300, Melbourne, Florida. OmniPay operates via the Internet using the domain name www.omnipay.com.

10. According to the OmniPay and E-Gold websites, "Gold & Silver Reserve, Inc. (G&SR), a Delaware Corporation, developed and deployed the e-gold payment system in 1996, and through 1999 administered both payment settlement and currency exchange. In January 2000, the core e-gold roles of Issuance and Settlement were devolved to e-gold Ltd., a Nevis W.I. company created specifically to serve as the General Contractor responsible for performance of the e-gold Account User Agreement . . . This separation of roles was designed to further assure e-gold's freedom from default risk and finality of settlement by dissociating the e-gold Issuer from business risks relating to exchange. G&SR, Inc. continues to serve as Operator of the e-gold payment system,

as well as offering its own innovative set of hybrid currency exchange services, known as OmniPay."
E-gold, Ltd. is also operated by Douglas Jackson, Barry Downey, and Reid Jackson.

11. OmniPay provides customers with a mechanism to convert national currency into E-Gold, and E-Gold into national currency. OmniPay also offers a bill payment service for E-Gold customers. The home page of the OmniPay website describes OmniPay's three primary services:

1. InExchange Service. The InExchange service changes national currency into a value associated with a particular e-metal.
2. M2M Service. The M2M service transfers value from one e-metal account to another e-metal account.
3. OutExchange Service. The OutExchange service changes the value in an e-metal account to national currency.

12. The terms "InExchange" and "OutExchange" are vernaculars for the traditional banking terms "deposit" and "withdrawal," respectively. E-Gold account holders deposit funds into their E-gold account via OmniPay's "InExchange" service, which permits a user to convert a national currency into an e-metal. Currently, OmniPay accepts national currencies from Canada, France, Germany, Japan, Switzerland, the United Kingdom and the United States for exchange. To fund an E-Gold account via OmniPay's "InExchange" service, an individual opens an account with OmniPay by providing a valid email address (which is validated by OmniPay) a postal address, and a valid E-Gold account. OmniPay only accepts bank wires from account holders in the amount of $1,000 or more to fund an E-Gold account. Once the wire is received by OmniPay, the customer's E-Gold account is credited for that amount of gold. The E-Gold account will show the number of ounces available, not the dollar amount. The OmniPay website states that OmniPay accepts remittances through Federal Reserve Financial Services (*e.g.*, FedWire), Swift, and E-Gold. By accepting remittances only through bank wires (FedWire and Swift), OmniPay guarantees its receipt of funds from its customers and eliminates risks associated with other payment instruments, such as bounced

checks or counterfeit traveler's checks.

13.     OmniPay's OutExchange service allows E-Gold account holders to withdraw value from their e-metal account into a national currency via bank wire or check. The following are the fees associated with the OutExchange Service:

| Type | Fee |
| --- | --- |
| Check -- postal mail | $1 |
| Check – courier | $20 |
| Bank Wire – within US | $20 |
| Bank Wire – outside US | $40 |

E-Gold account holders can also exchange their E-metal for other E-metals using Omnipay's "M2M" service.

14.     OmniPay also offers other services, including a bill payment service. An advertisement on the OmniPay website states: "Pay your bills with e-gold; Pay your mortgage, utilities, credit card, butcher, baker, candlestick maker - in short - all your bills with e-gold." When a customer wants to use the bill pay service, the customer accesses the OutExchange service and requests payment of a certain bill. OmniPay then debits the customer's E-Gold account and "converts" the corresponding value into currency. OmniPay will write a check to the creditor for a $1 fee or send a domestic wire for $20 (the fee for an international wire is $40). OmniPay also receives a fee of 1% or 50 cents from the recipient of the payment.

15.     G&SR receives 40% of all fee revenue generated by E-Gold where OmniPay acts as the exchanger. G&SR makes a market in the metals utilizing the bid/ask spread: that is, there is a 4% difference in the "In-Exchange" versus "Out-Exchange" rates. The OmniPay website at http://www.omnipay.com/currentexchange.asp provides a chart with Current OmniPay Exchange Rates and Fees for InExchange payments (i.e., deposits), OutExchange remittances (i.e.,

withdrawals), and metal to metal remittances (i.e., transfers).

16. Title 18, United States Code, Section 1960 provides that:

(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b) As used in this section

(1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and

(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

(C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

(c) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

17. With regard to the registration requirements established in Section 1960(b)(1)(B), a money transmitting business is required to register by filing the appropriate information with the Financial Crimes Enforcement Network ("FinCEN"), an agency within the Department of Treasury. 31 U.S.C. § 5330(a); 31 C.F.R. § 103.41(a)(1) and (b).

18. The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license

from the Superintendent. D.C. Stat. § 26-1002. Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment. D.C. Stat. § 26-1023.

19. Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer." D.C. Stat. § 26-1001(10).

20. The Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408, prohibits a person from engaging in the business of a money transmitter without registering with the Office of Financial Regulation. Fla. Stat. § 560.125(1). Violation of the money transmitter statute is a felony. Specifically, the penalties for violating this statute are as follows: (1) if currency or payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person has committed a third degree felony; (2) if currency or payment instruments total or exceed $20,000 but are less than $100,000 in any 12-month period, the person has committed a second degree felony; and (3) if currency or payment instruments total or exceed $100,000, the person has committed a first degree felony. Fla. Stat. § 560.125(5)(a)-(c).

21. Under Florida Money Transmitters' Code, the term "money transmitter" includes any person located in or doing business in Florida who acts as a payment instrument seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider." Fla. Stat. § 560.103(11). The term "funds transmitter" includes "any person who engages in the receipt of currency or payment instruments for the purpose of transmission by any means, including transmissions within this country or to or from locations outside this country, by wire, facsimile, electronic transfer, courier, or otherwise." Fla. Stat. § 560.103(10).

22. According to FinCEN records, no registration by Gold & Silver Reserve, Inc. d/b/a Omni Pay, EIN 58-2220023, had been filed for the period of December 31, 2001 through June 22, 2005. As of December 13, 2005, according to the FinCEN website at http://www.msb.gov/guidance/msbstateselector.php, which contains lists of businesses licensed as money transmitters with FinCEN in Florida and the District of Columbia (updated as of October 1, 2005), neither G&SR, OmniPay, nor E-Gold were registered as money transmitting businesses with FinCEN.

23. According to a Certificate of Record issued by the State of Florida, Office of Financial Regulation in July, 2005, there is no record of licensure or application for licensure on file by G&SR or OmniPay. As of December 13, 2005, according to the Florida Office of Financial Regulation website at http://www.flofr.com/licensing/download.htm (updated as of December 5, 2005), neither G&SR nor OmniPay were registered as money transmitting business within the State of Florida.

24. As of December 7, 2005, information from a Financial Institutions Examinations Officer at the Department of Insurance, Securities, and Banking in the District of Columbia indicated that a search of their databases had been conducted and that no record of license or registration as a money transmitting business had been found for G&SR and/or OmniPay in the District of Columbia.

25. Prior to February, 2005, G&SR d/b/a OmniPay held its operating accounts at Wachovia bank. On or about February, 2005, OmniPay closed its Wachovia accounts and opened Regions Bank account number xxxxxx4851, which became its main operating account for wire transfers. This is the account into which OmniPay customers are directed to send funds (by wire transfer over $1,000) for exchange into E-Gold. Additionally, G&SR d/b/a OmniPay opened a

SunTrust account on December 7, 2004, which it uses to provide its exchange service for bill payment orders.

26.     With respect to the primary wire account used by OmniPay at Wachovia Bank, from June 1, 2004 through February 8, 2005, over $8.5 million was received in 430 incoming wire transfers and over $8.7 million was sent in 238 outgoing wire transfers. These transactions involved incoming and outgoing wire transfers from and to other digital currency exchangers as well as individual customers.

27.     With respect to Regions Bank account number xxxxxx4851 in the name of G&SR – Op. Wires, from February 4, 2005 through September 30, 2005, $17,940,371.83 million was received in 839 incoming wire transfers and over $17,519,899.42 million was sent in 460 outgoing wire transfers from and to other digital currency exchangers as well as individual customers. This activity, as well as the instructions posted on OmniPay's website, indicate that this account is being used as OmniPay's primary account for incoming and outgoing wires of currency.

28.     With respect to SunTrust Bank account xxxxxxxxx8359 in the name of G&SR, from December 7, 2004 (the opening date of the account) through October 31, 2005, this account received over $3.1 million in 96 incoming wire transfers from G&SR's Regions Bank account number xxxxxx4851. Also during this time period, over $3 million was transferred out by G&SR in 2,432 individual checks. A sampling of the checks issued from this account during the first ten days of September, 2005, reveals checks in amounts ranging from $61.30 to $90,000, with most checks being in the range of $100-500. The checks include a notation that "[t]his is a payment on behalf of our mutual customer," and payees are individuals and businesses, including, for example, insurance companies, a law firm, and an internet computer merchant. Accordingly, there is probable cause to believe that this account is being used to fulfill orders placed through OmniPay's bill

payment service, which allows OmniPay/E-Gold customers to order an "outexchange" of E-Gold for payment of a bill whereby OmniPay issues a check on the customer's behalf.

## COUNT I

29. All allegations contained in paragraphs 1 through 12 are re-alleged and incorporated, herein, by reference.

30. In light of the above-described events, there is reason to believe that the defendant funds were involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960 of Title 18, United States Code, and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that process of warrant issue for the arrest of the defendant funds as described above; that due notice be given to all interested persons to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property to be forfeited to that United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court

may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN
United States Attorney
D.C. Bar No. 451058

_____
WILLIAM R. COWDEN
Assistant United States Attorney
D.C. Bar No. 426301

_____
LAUREL LOOMIS RIMON
Assistant United States Attorney
555 4th St., NW
Room 5830
Washington, D.C. 20530
(202) 514-7788

## VERIFICATION

I, Roy Dotson, Special Agent with the United States Secret Service, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Complaint for Forfeiture, in rem, is based upon reports and information furnished to me by law enforcement agents and that everything contained therein is true and correct to the best of my knowledge and belief.

Executed on this ___ day of December, 2005.

_____
Roy Dotson
Special Agent
United States Secret Service