**CLAIMANT GOLD & SILVER RESERVE, INC.'s SECOND NOTICE OF FILING IN PARALLEL PROCEEDINGS**

# EXHIBIT 1

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In the Matter of the Search of

Gold & Silver Reserve, Inc.
DBA OmniPay
175 East Nasa Boulevard, Suite 300
Melbourne, FL 32901

**FILED UNDER SEAL**
Case No. 05-M-3201
Before the Honorable
Karla R. Spaulding

## MOTION FOR THE RETURN OF PROPERTY PURSUANT TO RULE 41(g) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND REQUEST FOR AN EVIDENTIARY HEARING ON THE MATTER [1]

COMES NOW, the Respondent, GOLD & SILVER RESERVE, INC., by and through undersigned counsel, and moves this Court to order the return of the property seized pursuant to the December 16, 2005 Search Warrant signed in this case and to hold an evidentiary hearing on this matter.

**IN SUPPORT THEREOF, it is respectfully shown to the Court:**

1.      On December 16, 2005, this Court signed a Search Warrant ordering the search of the offices of Gold & Silver Reserve, Inc., DBA OmniPay, 175 East Nasa Boulevard, Suite 300, Melbourne, FL 32901. (The Cover page of this Court's December 16, 2005 Search Warrant is attached hereto as Exhibit 1). That Warrant was executed over a 36 hour period beginning on December 16, 2005.

2.      Two days earlier (December 14, 2005) Magistrate Judge John Facciola of the United States District Court for the District of Columbia signed an Order authorizing

---

[1]  Filed contemporaneously with this motion is the Respondents' motion to vacate the August 15, 2005 consent order enforcing summonses that was entered in Case No. 6:05-mc-71-Orl-KRS, which is also before this Court. Additionally, the Respondents respectfully advise the Court that a forfeiture action filed pursuant to 18 U.S.C. §§ 981, 983 and 1960 was filed by the Government against the Respondent in the District Court for the District of Columbia on December 30, 2005, Case No. 1:05CV02497, before United States District Court Judge Rosemary M. Collyer. As such, in an abundance of caution and respect, each of these motions has been copied to Judge Collyer and Assistant United States Attorneys John Roth and William Cowden who are litigating the forfeiture action on behalf of the United States Attorney's Office in Washington, D.C.

the freeze of three of Gold & Silver Reserve, Inc.'s bank accounts. (Magistrate Judge Facciola's Freeze Order was never provided to the Respondent and is therefore not attached to this pleading. However, the Affidavit which led to the issuance of the order was provided to the Respondent – in redacted form – on December 29, 2005 and is therefore attached hereto, in its redacted form, as Exhibit 2).

3.      In open Court on December 29, 2005, before Magistrate Judge Facciola, upon the Respondent's request that the Order seizing their bank accounts be vacated, the parties discussed the merits of the Freeze Order signed by the Magistrate.[2] The Magistrate expressed, in no uncertain terms, that he was very seriously "concerned" about both the application for and issuance of the seizure order. The Magistrate explained that upon application he was told that a) the Respondents were knowingly furthering the child pornography business, and b) no third party would be injured by the issuance of the seizure order.

4.      Each piece of information provided to the Magistrate was false. First of all, at the hearing before Magistrate Judge Facciola, the Government could offer no proof – reliable or otherwise – that the Respondent was in some way engaged in the knowing trade or distribution of child pornography. The Magistrate openly recognized that the statements made to him concerning that subject were fabrications.

5.      Secondly, the Magistrate further determined that the Secret Service lied when they informed him that no third parties would be injured as a result of the Freeze Order. Magistrate Judge Facciola expressed his concerns regarding this issue in his January 3, 2006 Memorandum Order:

> I hasten to add that I have been concerned about the nature of the seizure sought in this case from the moment that warrant was presented to me. Among other matters, I was most specifically concerned that third parties would have their checks and other negotiable instruments dishonored if the seizure order was issued. I was assured by government representatives that this would not occur. At the hearing,

---

[2] The proceeding before Magistrate Judge Facciola was filed under seal as Case No. 05-664 M-01 (JMF). The Respondent has since moved the Court to unseal the proceeding for purposes of transcribing it, but the Court has yet to rule on the issue. As such, the Respondent is currently unable to furnish a copy of that transcript to this Court.

2

> however, counsel for GSR consulted with his clients, the
> principals of GSR, and indicated to me that hundreds of its
> clients' negotiable instruments had been dishonored or
> were about to be. I am, therefore, referring this matter to
> the Chief Judge immediately.

*See*, Memorandum Order by Magistrate Judge John M. Facciola, January 3, 2006
(Attached hereto as Exhibit 3).[3]

      6.    The Respondent respectfully notes that *this Court* was lied to in a similar
fashion as was Magistrate Judge Facciola, and the result of that was an illegal search
warrant; *see, Franks v. Delaware*, 438 U.S. 154 (1978). Therefore, the Respondent
moves this Court, pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure, for
the release of the property removed from its offices. The Respondent similarly requests
an evidentiary hearing on this matter.

      7.    Rule 41(g) of the Federal Rules of Criminal Procedure provides as
follows:

> **(g) Motion to Return Property.** A person aggrieved by an
> unlawful search and seizure of property or by the
> deprivation of property may move for the property's return.
> The motion must be filed in the district where the property
> was seized. The court must received evidence on any
> factual issue necessary to decide the motion. If it grants, the
> motion, the court must return the property to the movant,
> but may impose reasonable conditions to protect access to
> the property and its use in later proceedings.

---

[3]   In the Magistrate Judge's January 3, 2006 Memorandum Order, although the
Magistrate Judge penned his distaste for the methods employed by the Secret Service in
securing the Freeze Order, the Magistrate Judge – citing a lack of subject matter
jurisdiction – declined to vacate the Order; *see*, Exhibit 3, p.4. Gold & Silver Reserve,
Inc. immediately moved the Magistrate to reconsider its Order pursuant to *In the Matter
of the Search of 4330 North 35th Street, Milwaukee, Wisconsin*, 142 F.R.D. 161 (E.D.
Wis. 1992), which clearly provided the Magistrate the authority to order on Gold &
Silver Reserve, Inc.'s motion. However, because the Government *arrested* the
Respondent's bank accounts the day after the hearing before the Magistrate, the
Magistrate's previously entered *seizure* order was rendered moot. Nevertheless, in open
Court on January 13, 2006, the Government conceded to the release of the Respondent's
bank accounts, although the *arrest of the contents* of those bank accounts remains in
effect.

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

8.    As stated by the District Court in *In the Matter of the Search of the Offices...*, 2005 U.S. Dist. LEXIS 6870, 20 (D.Me. 2005) ("*Amato*") "...Rule 41(g) provides a **pre-indictment right** to seek return of property on two alternative bases, one of which is the commission of an unlawful search and seizure." [Emphasis added]; *citing, In re Search of 8420 Ocean...*, 353 F.Supp.2d 577, 579 (D.Md. 2004) ("...the plain language of Fed. R. Crim. P. 41(e) allows [respondent] to file a motion challenging the search and seizure as illegal, as without probable cause, prior to return of any indictment.") [4]

9.    "Generally, the government is not required to demonstrate probable cause for seizing property until the forfeiture trial. However, if a claimant challenges the validity of a seizure, as the Petitioners have done here, then the merits of the forfeiture trial are expedited and the government must establish probable cause for the forfeiture prior to the forfeiture trial. Accordingly, the Government must demonstrate here that it had probable cause to believe that the accounts seized are subject to forfeiture." *In re the Seizure of All Funds...*, 887 F.Supp.435, 449 (E.D.N.Y. 1995) (internal citations omitted) [Emphasis added]; *citing, Marine Midland Bank, N.A. v. United States*, 11 F.3d 1119, 1124-26 (2d Cir. 1993).

10.    The Respondent moves this Court for the immediate release of the property seized pursuant to an illegal Search Warrant and thereby challenges the Government to demonstrate that it had probable cause to believe that the property ultimately seized from the offices of Gold & Silver Reserve, Inc. was either the fruit or the evidence of a crime or any criminal activity. The Respondent respectfully argues that the Government lacked the requisite probable cause and, as such, the warrant executed at the offices of Gold & Silver Reserve, Inc. was illegal.

11.    To be sure, as detailed earlier in this motion, Magistrate Judge Facciola from the District Court for the District of Columbia has previously expressed his concern

---

[4] As the Court explained in *Amato*, 2005 U.S. Dist. LEXIS, at 20, n.11, "Rule 41(e) formerly governed motions for return of property. As part of a general restyling not intended to affect its substance, it was redesignated Rule 41(g)...Thus, it remains appropriate to look for guidance to caselaw construing former Rule 41(e)." (internal citations omitted).

4

and distaste for the manner in which the Government secured his signature on the Order that led to the freeze of the Respondent's several bank accounts. It appears likely that this Court was persuaded to sign the search warrant in the same illegal and unconstitutional way that Magistrate Judge Facciola was; *see*, ¶¶ 3-5, *supra*; *Franks*, *supra*.

12.    Furthermore, even ignoring the issue of whether this Court was furnished with false, misleading, material statements prior to its signing of the search warrant, the Government cannot establish that probable cause exists to believe that the Respondent committed any crime at any time.[5]

13.    The Government cannot establish that probable cause exists to believe that the Respondent has acted as an unlicensed money transmitting business in violation of 18 U.S.C. § 1960. That statute provides that "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an **unlicensed money transmitting business**, shall be fined in accordance with this title or imprisoned not more than 5 years, or both." [Emphasis added].

14.    As provided in 31 U.S.C. § 5330, a "money transmitting business" is defined as having the following three essential elements:

> (1) Money transmitting business. The term "money transmitting business" means any business other than the United States Postal Service which –
> (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;
> (B) is required to file reports under [31 USCS § 5313]; and
> (C) is not a depository institution (as defined in [31 USCS § 5313(g)]).

---

[5]  The Respondent was never noticed of the legal bases – if any – of the Search Warrant. All the Respondent received was the cover page of the Warrant, which included this Court's signature and an extremely generic description of the location to be searched. That being said, the proceedings in Washington, D.C. noticed the Respondent that the Government was moving to forfeit the Respondent's property pursuant to 18 U.S.C. § 1960. As such, the Respondent proceeds *sub judice* using the notice it received in that case as constructive notice of the Government's theory of prosecution in this one.

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

*See, United States v. Puche*, 350 F.3d 1137, 1141, n.2 (11th Cir. 2003) ("A money transmittal company is a non-bank financial institution that sells money orders, cashes checks, and sends money by wire outside the United States.")

15.     Consequently, in order to parry a motion for the return of property pursuant to Rule 41(g), the Government must establish at a hearing that it has probable cause to believe that the Respondent demonstrates each of the three elements of a money transmitting business. The Government cannot accomplish that task. The Respondent does not provide check cashing, currency exchange, or money transmitting or remittance services and has never been required to file reports under 31 U.S.C. § 5313; *see*, 31 U.S.C. 5330(1). The Respondent is not a money transmitting business and has never purported to be one.

16.     In open court on December 29, 2005 and January 13, 2006, counsel for the Respondent provided the Court (Magistrate Judge Facciola and District Judge Collyer, respectively) with the record of the Respondent's compliance with approximately 300 summonses, subpoenas and other requests for information from a variety of Federal agencies both within and separate from the Department of the Treasury. This record proved that the Government had not only known of Gold & Silver Reserve, Inc.'s business since Gold & Silver Reserve, Inc.'s inception, but that the Government had been requesting crucial information from Gold & Silver Reserve, Inc. (concerning third parties and Gold & Silver Reserve, Inc.) throughout that time. However, at no time during that 9-year history did any Government office or agent inform Gold & Silver Reserve, Inc. that it was either a) operating as an unlicensed money transmitting business, b) neglecting to file § 5313 reports, or c) acting in any other illegal or unlawful way.

17.     It is thus intriguing that the plain language of the cover page of the Search Warrant reveals that, upon signing the Search Warrant, this Court was "satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now **concealed** on the person or premises above-described and establish probable cause for the warrant." *See*, Exhibit 1; [Emphasis added]. Indeed, that language reveals that further false statements were presented to this Court prior to its signing of the Search Warrant in this case.

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

18.     As previously stated, *see* fn.1, the parties are engaged in parallel proceedings before this Court. In that case, Case No. 6:05-mc-71-Orl-KRS, this Court signed a Consent Order to Enforce Summonses on August 15, 2005. Both prior to and following the entering of that Consent Order, the parties engaged in good faith efforts to resolve the subject matter of that case. Those efforts only ceased as a necessary consequence of the December 16, 2005 Search Warrant which rendered it impossible for the Respondent to comply with the terms of the Consent Order.

19.     Ultimately, it is beyond dispute that the Application for the Search Warrant in this case was presented to this Court while the parties (the United States and the Respondent) were working in the utmost good faith to comply with this Court's Consent Order in Case No. 6:05-mc-71-Orl-KRS. It is also beyond dispute that the Respondent has complied with approximately 300 summonses, subpoenas and other requests for information from a variety of Federal agencies both within and separate from the Department of the Treasury over the past two years. In light of that transparency, it necessarily follows that the Agent's statement that evidence of a crime was **"concealed"** at Gold & Silver Reserve, Inc.'s offices was either false or told with a reckless and willful disregard for the truth. There was simply no other way for that statement to have been made.

20.     In conclusion, it appears that because the Government could not establish that probable cause existed to believe that the Respondent ever acted as an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, it provided false statements to this Court in an effort to illegally search the Respondent's offices and seize the contents of same. Therefore, following an evidentiary hearing on the matter, everything seized pursuant to that illegal search warrant should be immediately returned to the Respondent.

WHEREFORE, for the foregoing reasons, the Respondent, GOLD & SILVER RESERVE, INC., respectfully requests that this Court order the return of the property seized pursuant to the December 16, 2005 search warrant signed in this case and hold an evidentiary hearing on this matter.

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

Case No. 05-M-3201

Respectfully submitted,

/s/ *Andrew S. Ittleman*
Mitchell S. Fuerst, Esq.
Florida Bar No. 264598
Andrew S. Ittleman, Esq.
Florida Bar No. 802441
Rodriguez O'Donnell Ross Fuerst
  Gonzalez Williams & England, P.C.
1001 Brickell Bay Drive, Suite 2002
Miami, FL 33131
305-350-5690 (o)
305-371-8989 (f)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

**MOTION FOR THE RETURN OF PROPERTY PURSUANT TO RULE 41(g) OF
THE FEDERAL RULES OF CRIMINAL PROCEDURE AND REQUEST FOR AN
EVIDENTIARY HEARING ON THE MATTER**

was served on January 31, 2006 by facsimile upon Robert L. Welsh at the Department of
Justice, Tax Division, P.O. Box 14198 Ben Franklin Station, Washington, DC 20044;
William Cowden, Assistant United States Attorney, 555 4th Street, NW, Room 4824,
Washington, D.C. 20530; and John Roth, Esq., Chief, Fraud and Public Corruption
Section of the Office of the United States Attorney in Washington, D.C.

/s/ *Andrew S. Ittleman*
Mitchell S. Fuerst, Esq.
Florida Bar No. 264598
Andrew S. Ittleman, Esq.
Florida Bar No. 802441
Rodriguez O'Donnell Ross Fuerst
  Gonzalez Williams & England, P.C.
1001 Brickell Bay Drive, Suite 2002
Miami, FL 33131
(305) 350-5690 (o)
(305) 371-8989 (f)

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

# MOTION FOR THE RETURN OF PROPERTY PURSUANT TO RULE 41(g) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND REQUEST FOR AN EVIDENTIARY HEARING ON THE MATTER

# EXHIBIT 1

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

AO 93 (Rev. 6/98) Search Warrant                                                        RBH/mr

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

Gold & Silver Reserve, Inc.
DBA OmniPay
175 East Nasa Boulevard, Suite 300
Melbourne, FL 32901

## SEARCH WARRANT

CASE NUMBER: 05- M. 3201

TO:    Any United States Marshal and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Roy Dotson has reason to

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

Gold & Silver Reserve, Inc., DBA OmniPay, 175 East Nasa Boulevard, Suite 300, Melbourne, FL 32901, more particularly described in Attachment "A".

In the Middle District of Florida, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment "B"

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before December 26, 2005 (not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime--6:00 A.M. to 10:00 P.M.)(at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to Karla R. Spaulding, United States Magistrate Judge as required by law.

December 16, 2005
Date and Time Issued

at      Orlando, Florida
        City and State

Karla R. Spaulding
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

AO 93 (Rev. 8/98) Search Warrant                                                    RBH/mv

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

136 Island View Drive
Indian Harbor Beach, FL

**SEARCH WARRANT**

CASE NUMBER: 05MJ3199

TO:    Any United States Marshal and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Roy Dotson has reason to

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

136 Island View Drive, Indian Harbor Beach, FL, more particularly described in Attachment "A".

In the Middle District of Florida, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment "B"

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before December 28, 2005 (not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime--6:00 A.M. to 10:00 P.M.)(at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to Karla R. Spaulding, United States Magistrate Judge as required by law.

December 16, 2005                    at        Orlando, Florida
Date and Time Issued                          City and State

Karla R. Spaulding
United States Magistrate Judge                 _Karla R. Spaulding_
Name & Title of Judicial Officer               Signature of Judicial Officer

# MOTION FOR THE RETURN OF PROPERTY PURSUANT TO RULE 41(g) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND REQUEST FOR AN EVIDENTIARY HEARING ON THE MATTER

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

**All funds on deposit in Regions Bank account number 67-0919-4851, in the name of Gold and Silver Reserve, Inc.**

FILED

DEC 1 4 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

CASE NUMBER: 05- _____

I, _____Roy D. Dotson_____ being duly sworn depose and say:

I am a(n) _____Special Agent with the United States Secret Service_____ and have reason to believe that within the jurisdiction of this Court there is now certain property that is subject to forfeiture to the United States, namely (describe the property to be seized)

> all funds on deposit in Regions Bank account number 67-0919-4851, in the name of Gold and Silver Reserve, Inc.

which are (state one or more bases for seizure under the United States Code) funds involved in the operation of an unlicensed money transmitting business in violation of Title 18, United States Code 1960, and therefore subject to forfeiture

concerning a violation of Title _18_ United States Code, Section(s) 981(a)(1)(A). The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.     ☒ YES   ☐ NO

Laurel Loomis Rimon
Asset Forfeiture Unit, Criminal Division
(202) 514-7788

X _____
Signature of Affiant
Roy D. Dotson, Special Agent
United States Secret Service

Sworn to before me, and subscribed in my presence

Date _____DEC 1 4 2005_____

_____JOHN M. FACCIOLA_____
_____U.S. MAGISTRATE JUDGE_____
Name and Title of Judicial Officer

at Washington, D.C.

_____
Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## AFFIDAVIT IN SUPPORT OF A SEIZURE WARRANT

I, Roy Dotson, ("your Affiant"), being duly sworn, depose and state as follows:

1.      I am a Special Agent ("SA") of the United States Secret Service ("USSS"), and have been so employed for approximately two and one half years. I am currently assigned to the Orlando Field Office. Among my duties as a Special Agent, I am charged with the investigation of financial crimes, including check fraud, identity fraud, credit card fraud, bank and wire fraud and the manufacturing, possession and passing of counterfeit United States currency. Prior to my employment with the USSS, I was employed by the Brevard County Sheriff's Office for nine years. My last assignment was that of a Federal Task Force Agent with the Drug Enforcement Administration. Among my duties as a Task Force Agent, I was charged with investigating large criminal organizations that distributed and sold controlled substances and financial crimes involving money laundering. Several of the investigations resulted in the seizures of criminally derived property, including, but not limited to, monetary instruments.

2.      The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other law enforcement officers; review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.

3.      This affidavit is being submitted in support of an application for a seizure warrant, based upon 18 U.S.C. § 981(b)(1), for the following items:

1

a.  All funds on deposit in Regions Bank account number 67-0919-4851, in the name of Gold and Silver Reserve, Inc.

b.  All funds on deposit in SunTrust account number 1000028078359, in the name of Gold and Silver Reserve, Inc.

4.  The two bank accounts listed above are owned and operated by Gold & Silver Reserve, Inc. doing business as OmniPay, which is a company that offers to exchange United States (and several other countries') currency into E-Gold, a private "digital" currency offered through the internet and purportedly backed by gold bullion. OmniPay provides three currency exchange services: (1) receiving national currency by wire for conversion into E-Gold; (2) converting E-Gold back into national currency (which may then be sent to the customer by wire transfer, check, or a bill paid to a third party on their behalf); and (3) conversion of E-Gold into another e-metal currency.

5.  Based upon the evidence uncovered, there is probable cause to believe that the funds on deposit in the two identified bank accounts constitute property involved in OmniPay's operation of an unlicensed money transmitting business in the District of Columbia and elsewhere, in violation of Title 18, United States Code, Section 1960. Further, there is probable cause to believe that any funds that may be deposited, including funds valued at $17,940,371.83 with respect to the Regions Bank account, and including funds valued at $3,100,000.00 with respect to the SunTrust Bank account, will constitute property involved in OmniPay's operation of an unlicensed money transmitting business in the District of Columbia and elsewhere, in violation of Title 18, United States Code, Section 1960, or identical property found in the same place or account, within one year, as the property involved in the offense giving rise to forfeiture, and therefore subject to seizure for forfeiture as provided by 18 U.S.C. § 984(a)(2).

2

6.     For the reasons set forth more fully below, probable cause exists to believe that all funds on deposit in the accounts listed above are subject to seizure and forfeiture under Title 18, United States Code, Section 981(a)(1)(A) because the funds at issue are property involved in the operation of an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960. Because this affidavit is being submitted for the limited purposes of establishing probable cause, I have not included every detail of every aspect of the investigation for this affidavit. Rather, it only includes the information necessary to prove that probable cause exists for a seizure warrant to be issued for property that was involved in the operation of an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960.

## BACKGROUND ON DIGITAL CURRENCY ISSUERS AND EXCHANGERS

7.     The term "digital currency" has been adopted by Internet-based "sellers" of gold, silver, platinum, palladium, and other metals to describe the use of precious metals as a private currency for online payments. Issuers of digital currencies promote the global acceptance of precious metals, observing that a buyer paying with gold does not have to worry about access to, or acceptance of, underlying currencies. Merchants, online service providers, and individuals who are willing to receive payment in precious metals are allocated a quantity based on the day's market price. While taking delivery of the actual metal appears, technically, to be an option, recipients typically "sell" the metal through a digital currency exchanger and receive payment in a more conventional form by "cashing" out some portion of their digital currency accounts. Recipients can also transfer ownership of some or all of their precious metal holdings to someone else. This transfer of ownership of the underlying metal through the crediting and debiting of

3

internet-based accounts is how online precious metal issuers facilitate payments on behalf of customers.

8.      There are many different types of digital currency issuers currently operating. One of the first issuers to enter the market, however, was E-Gold, Ltd. ("E-Gold"), described in detail below, which began in 1996. E-Gold appears to be one of the most popular and prominent digital currency issuers among users. E-Gold is traded through the internet and is accepted by a limited number of merchants and vendors. Investigation has shown that E-Gold is widely accepted in the markets for payments involving credit card and identification fraud, online gambling, high yield investment programs, and child pornography. E-Gold appears to have been established to provide a level of anonymity that enables users to circumvent banking regulations and avoid law enforcement scrutiny. E-Gold operates via the Internet using the domain name www.e-gold.com.

9.      Only a valid email address is required to open an E-Gold account. Although other contact information is requested, this information is not verified. E-Gold advertises on its website that there are no barriers to entry, that it costs nothing to open an E-Gold account, that there is no credit check, and that there is no minimum balance requirement.

10.     There are four primary steps involved in a financial transaction using a digital currency process (from the customer's perspective): (i) opening a digital currency account; (ii) converting national currency into a digital currency through an exchanger to fund the digital currency account; (iii) using value in the account to buy or sell a good or service; and (iv) exchanging value in the account back into national currency. Accordingly, digital currency issuers need two additional parties to complete these steps: (i) digital currency exchangers; and

4

(ii) merchants that accept digital currencies for the payment of goods and services.

11.    A person wishing to use a digital currency to purchase a good or service must first open an account with a digital currency issuer, which typically can be done online by providing only a valid email address. In order to fund a digital currency account, issuers typically require a customer to use the services of a third party digital currency exchanger. The exchangers generally operate independently from digital currency issuers. Exchangers provide services for customers wishing to engage in the buying, transferring, and selling of online precious metals. In particular, exchangers take national currency from customers and exchange it into a digital currency for purposes of funding, or increasing the value of, an existing digital currency account. By the same token, exchangers also exchange the value in an account into national currency. Exchangers are typically the only method by which customers can obtain the value out of an account, short of taking possession of the precious metal itself. Each exchanger sets its own terms and conditions on the types and amounts of national currencies that will be accepted for exchange. Some only accept transfers from bank or credit card accounts. Others accept cash and money orders. Similarly, each exchange service offers different options for receiving funds. Some exchangers have physical locations, whereas others exist only virtually. There are many digital currency exchangers, including, for example, OmniPay, Goldnow and Incrementalgold.

## GOLD & SILVER RESERVE d/b/a OMNIPAY

12.    Gold & Silver Reserve, Inc. d/b/a OmniPay Corporate Structure. Gold & Silver Reserve, Inc. ("G&SR") d/b/a Omnipay, a Delaware Corporation, is a digital currency exchanger that offers currency exchange services for individuals wishing to purchase, transfer, and/or sell E-Gold. On May 12, 2005, I received information from the Delaware Secretary of State,

5

Corporations Division, Dover, Delaware that G&SR, Inc. was incorporated on January 24, 1996 in the State of Delaware as an E-Gold transnational monetary payment system. The principle officers listed were Douglas Jackson, President, Reid Jackson, Director, and Barry Downey, Secretary. According to a 2005 Dunn and Bradstreet report, G&SR d/b/a Omni Pay is an E-currency exchange services business. The Dunn and Bradstreet report further identified the business address as 175 E. Nasa Blvd., Suite 300, Melbourne, Florida. A search of commercially available databases disclosed that the following business names are associated with the address of 175 E. Nasa Blvd., Suite 300, Melbourne, Florida: G&SR Omni Pay, Gold & Silver Reserve, Inc, and Omni Pay. The contact telephone number for G&SR, Inc., and OmniPay, as well as for E-Gold, is (321) 956-1200. OmniPay operates via the Internet using the domain name www.omnipay.com.

13.    <u>G&SR's Relationship to E-Gold Ltd.</u> On June 15, 2005, I accessed the OmniPay and E-Gold websites, both of which stated that "Gold & Silver Reserve, Inc. (G&SR), a Delaware Corporation, developed and deployed the e-gold payment system in 1996, and through 1999 administered both payment settlement and currency exchange. In January 2000, the core e-gold roles of Issuance and Settlement were devolved to e-gold Ltd., a Nevis W.I. company created specifically to serve as the General Contractor responsible for performance of the e-gold Account User Agreement . . . This separation of roles was designed to further assure e-gold's freedom from default risk and finality of settlement by dissociating the e-gold Issuer from business risks relating to exchange. G&SR, Inc. continues to serve as Operator of the e-gold payment system, as well as offering its own innovative set of hybrid currency exchange services, known as OmniPay."[1]

14.   "E-gold" is advertised on e-gold.com to be "an electronic currency, issued by e-gold, Ltd., a Nevis corporation, 100% backed at all times by gold bullion in allocated storage." E-Gold, Ltd. is a Nevis corporation established in January 2000 by Douglas Jackson, M.D. ("Jackson") and Barry K. Downey, Esq. ("Downey"), and held in the name of the Bullion Reserve Special Purpose Trust, a Bermuda trust. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16.   OmniPay's Digital Currency Exchange Services  OmniPay provides customers

with a mechanism to convert national currency into E-Gold, and E-Gold into national currency. OmniPay also offers a bill payment service for E-Gold customers. The home page of the OmniPay website describes OmniPay's three primary services:

    a.    InExchange Service. The InExchange service changes national currency into a value associated with a particular e-metal.

    b.    M2M Service. The M2M service transfers value from one e-metal account to another e-metal account.

    c.    OutExchange Service. The OutExchange service changes the value in an e-metal account to national currency.

    17.    The terms "InExchange" and "OutExchange" are vernaculars for the traditional banking terms "deposit" and "withdrawal," respectively. E-Gold account holders deposit funds into their E-gold account via OmniPay's "InExchange" service, which permits a user to convert a national currency into an e-metal. Currently, OmniPay accepts national currencies from Canada, France, Germany, Japan, Switzerland, the United Kingdom and the United States for exchange. To fund an E-Gold account via OmniPay's "InExchange" service, an individual opens an account with OmniPay by providing a valid email address (which is validated by OmniPay) a postal address, and a valid E-Gold account. OmniPay only accepts bank wires from account holders in the amount of $1,000 or more to fund an E-Gold account. Once the wire is received by OmniPay, the customer's E-Gold account is credited for that amount of gold. The E-Gold account will show the number of ounces available, not the dollar amount. The OmniPay website states that OmniPay accepts remittances through Federal Reserve Financial Services (*e.g.*, FedWire), Swift, and E-Gold. By accepting remittances only through bank wires (FedWire and Swift), OmniPay guarantees its receipt of funds from its customers and eliminates risks associated with other payment instruments, such as bounced checks or counterfeit traveler's

checks.

18.     OmniPay's OutExchange service allows E-Gold account holders to withdraw

value from their e-metal account into a national currency via bank wire or check.  The following

are the fees associated with the OutExchange Service:

| Type | Fee |
|------|-----|
| Check -- postal mail | $1 |
| Check -- courier | $20 |
| Bank Wire -- within US | $20 |
| Bank Wire -- outside US | $40 |

E-Gold account holders can also exchange their E-metal for other E-metals using Omnipay's

"M2M" service.

19.     OmniPay also offers other services, including a bill payment service.  An

advertisement on the OmniPay website states: "Pay your bills with e-gold; Pay your mortgage,

utilities, credit card, butcher, baker, candlestick maker - in short - all your bills with e-gold."

When a customer wants to use the bill pay service, the customer accesses the OutExchange

service and requests payment of a certain bill.  OmniPay then debits the customer's E-Gold

account and "converts" the corresponding value into currency.  OmniPay will write a check to

the creditor for a $1 fee or send a domestic wire for $20 (the fee for an international wire is $40).

OmniPay also receives a fee of 1% or 50 cents from the recipient of the payment.

20.     G&SR receives 40% of all fee revenue generated by E-Gold where OmniPay acts

as the exchanger.  G&SR makes a market in the metals utilizing the bid/ask spread; that is, there

is a 4% difference in the "In-Exchange" versus "Out-Exchange" rates.  The OmniPay website at

http://www.omnipay.com/currentexchange.asp provides a chart with Current OmniPay Exchange

9

Rates and Fees for InExchange payments (i.e., deposits), OutExchange remittances (i.e., withdrawals), and metal to metal remittances (i.e., transfers).

21.    After comparing the complexity of transactions and fees incurred to either fund or to spend e-gold versus simply wiring funds through traditional banking institutions, there appears to be no economically sound reason for using e-gold to make funds transfers or payments other than to avoid reporting requirements. There is an obvious lure for criminals to use this system simply because those individuals wishing to retain their anonymity and escape the scrutiny of financial institutions will gladly accept a 20% fee on their transactions as a simple cost of doing business.

22.    Investigation has revealed that while traditional banking institutions require only one transaction plus flat fees to wire funds, two or three layers of transactions are required to fund an e-gold account. In order to begin the process, the individual responsible for funding the account typically makes a cash transaction with a money exchanger such as OmniPay, Western Union, or some other money service business. This represents the first layer of transactions and a percentage of the amount sent is assessed as a cost.

23.    The second layer involves conducting a transaction with an e-gold/e-metal exchanger in order to actually fund the e-gold/e-metal account. The individual funding the account wires the funds from the money service business to the exchanger and specifies which e-gold account is to be funded. At this level, additional fees are incurred. Fees/percentages incurred per transaction depend largely on the exchanger used. In some instances, the exchanger will charge up to 5% of the amount of funds transferred. These fees assessed by the exchanger are termed "service fees."

10

24. The final layer in this process is actually funding the e-gold account itself. E-gold charges for both storage and transaction fees. Storage fees are incurred on a monthly basis and are based on the balance of the account. Usually the fees turn out to represent approximately 1% of the account balance per year. E-gold also charges each account holder a fee to receive payment for each transaction. This fee could ranges anywhere from 1-5% and is based on the number of ounces of e-gold exchanged. The fees are published on e-gold's Internet site and updates are reflected as changes occur. Accordingly, an account holder can expect to spend upwards of 10-15% or more of the funds they wish to transfer into e-gold.

25. By comparison, a review of wire transfer costs at various banking institutions (including Bank of America, Citibank, HSBC, SunTrust, and Wachovia) revealed that the average costs of sending and receiving domestic and international wires is as follows:

> Domestic Incoming Wire: $11
> Domestic Outgoing Wire: $25
> International Incoming Wire: $16
> International Outgoing Wire: $41

Further, fees charged by banking institutions do not change regardless of the amount of funds being wired, unlike with E-Gold.

## CRIMINAL ACTIVITY

A. Applicable Law

26. Title 18, United States Code, Section 1960 provides that:

> (a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

> (b) As used in this section

11

(1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and

> (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;
>
> (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or
>
> (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

(c) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

27.    With regard to the registration requirements established in Section 1960(b)(1)(B), a money transmitting business is required to register by filing the appropriate information with the Financial Crimes Enforcement Network ("FinCEN"), an agency within the Department of Treasury. 31 U.S.C. § 5330(a); 31 C.F.R. § 103.41(a)(1) and (b).

28.    The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent. D.C. Stat. § 26-1002. Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment. D.C. Stat. § 26-1023.

29.    Under the D.C. Money Transmitters Act, the term "money transmission" is

12

defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer." D.C. Stat. § 26-1001(10).

30.    The Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408, prohibits a person from engaging in the business of a money transmitter without registering with the Office of Financial Regulation. Fla. Stat. § 560.125(1). Violation of the money transmitter statute is a felony. Specifically, the penalties for violating this statute are as follows: (1) if currency or payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person has committed a third degree felony; (2) if currency or payment instruments total or exceed $20,000 but are less than $100,000 in any 12-month period, the person has committed a second degree felony; and (3) if currency or payment instruments total or exceed $100,000, the person has committed a first degree felony. Fla. Stat. § 560.125(5)(a)-(c).

31.    Under Florida Money Transmitters' Code, the term "money transmitter" includes any person located in or doing business in Florida who acts as a payment instrument seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider." Fla. Stat. § 560.103(11). The term "funds transmitter" includes "any person who engages in the receipt of currency or payment instruments for the purpose of transmission by any means, including transmissions within this country or to or from locations outside this country, by wire, facsimile, electronic transfer, courier, or otherwise." Fla. Stat. § 560.103(10).

32.    Money transmitting businesses are also subject to 31 U.S.C. § 5318(h), which requires that all financial institutions shall establish an anti-money laundering program,

13

minimally including:

      a.     The development of internal policies, procedures, and controls;

      b.     The designation of a compliance officer;

      c.     an ongoing employee training program; and

      d.     an independent audit function to test programs.

The term "financial institution" includes both "a currency exchange" and a "person who engages as a business in the transmission of funds." 31 U.S.C. § 5312(a)(2)(J) and (R). More specific requirements relating to the anti-money laundering program required of a money service business are contained in regulations issued by the Department of the Treasury at 31 C.F.R. § 103.125.

      33.     Money transmitting businesses are also required to file reports of suspicious transactions ("Suspicious Activity Reports" or "SARs") conducted by their customers, where a transaction is in possible violation of a law or regulation. 31 U.S.C. § 5318(g).

B.     <u>Evidence of Unlicensed Money Transmitting</u>

      34.     On July 17, 2005, I received a Certificate of Official Record from the United States Department of Treasury, Internal Revenue Service (FinCEN) regarding a search of official records to determine the filing and non-filing of a Registration of Money Services Business. According to FinCEN records, no registration by Gold & Silver Reserve, Inc. d/b/a Omni Pay, EIN 58-2220023, had been filed for the period of December 31, 2001 through June 22, 2005. On December 13, 2005, I accessed the FinCEN website at http://www.msb.gov/guidance/msbstateselector.php and reviewed the lists of businesses licensed as money transmitters with FinCEN in Florida and the District of Columbia. The website states that the information is current as of October 1, 2005. Neither G&SR, OmniPay, nor E-Gold were

14

registered as money transmitting businesses with FinCEN.

35.    On July 11, 2005, I received a Certificate of Official Record from the State of Florida, Office of Financial Regulation regarding an official records search to determine whether Gold & Silver Reserve, Inc. d/b/a OmniPay, 175 E. Nasa Blvd., Ste 300, Melbourne, Florida, 32901, was licensed with the State of Florida as a money transmitter.  According to the Certificate of Record, there is no record of licensure or application for licensure on file.  On December 13, 2005, I accessed the Florida Office of Financial Regulation website at http://www.flofr.com/licensing/download.htm and reviewed the list of businesses licensed as money transmitters in the State of Florida. The website states that the last update occurred on December 5, 2005. Neither G&SR, OmniPay, nor E-Gold were registered as money transmitting business within the State of Florida.

36.    On December 7, 2005, I received information from a Financial Institutions Examinations Officer at the Department of Insurance, Securities, and Banking in the District of Columbia that a search of their databases had been conducted and that no record of license or registration as a money transmitting business had been found for G&SR and/or OmniPay in the District of Columbia.

37.    During the course of this investigation, agents have encountered no evidence that G&SR and/or OmniPay have established any aspect of an anti-money laundering program, nor have G&SR and/or OmniPay ever filed a Suspicious Activity Report in relation to suspicious transactions conducted by their customers.

38.    I have identified several bank accounts in the name of G&SR and/or OmniPay. Prior to February, 2005, G&SR d/b/a OmniPay held its operating accounts at Wachovia bank.

15

On or about February, 2005, OmniPay closed its Wachovia accounts and opened Regions Bank account number 67-0919-4851, which became its main operating account for wire transfers. This is the account into which OmniPay customers are directed to send funds (by wire transfer over $1,000) for exchange into E-Gold. Additionally, G&SR d/b/a OmniPay opened a SunTrust account on December 7, 2004, which it uses to provide its exchange service for bill payment orders.

39.



40.



41. 

42. 

43. 



44.



45.





46.

47.    I am advised that Title 18, United States Code, Section 981(b)(3) provides that "a seizure warrant may be issued . . . by a judicial officer in any district in which a forfeiture action against the property may be filed under Section 1355(b) of Title 28, and may be executed in any district in which the property is found . . . ." Inasmuch as the property subject to forfeiture is located in banks operating in, among other places, Alabama and Florida, and inasmuch as there is probable cause to believe that the funds in these accounts are subject to forfeiture as property involved in the operation of an unlicensed money transmitting business violation in the District of Columbia (thus establishing venue under Section 1355(b)), this District Court may issue, and caused to be served in any other district, the requested seizure warrant.

CONCLUSION

48.    Based upon the foregoing, and upon my training and experience, probable cause exists to believe that Gold and Silver Reserve d/b/a OmniPay and its agents have operated an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960, and that all funds in the bank accounts specifically described here are, therefore, subject to seizure and civil forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

49.    Wherefore, it is requested that seizure warrants be issued for the following items:

        a.      All funds on deposit in Regions Bank account number 67-0919-4851, in

19

the name of Gold and Silver Reserve, Inc.

b.    All funds on deposit in SunTrust account number 1000028078359, in the
name of Gold and Silver Reserve, Inc.

Special Agent

Sworn to and subscribed before me on this [ ] day of December, 2005.

United States Magistrate Judge

20

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### Chambers of Magistrate Judge John M. Facciola
### Suite 1426
### 333 Constitution Avenue, N.W.
### Washington, D.C. 20001

## TRANSMITTAL SHEET

To:            *Mr. Rodriguez, Esq.  2/295 - 3307*

Fax No.

From:          Chambers of Magistrate Judge John M. Facciola
               United States District Court for the District of Columbia

Telephone:     (202) 354-3130

Fax No.        (202) 354-3132

Date:          *Dec. 29, 2005*

Total Pages:   *22*

Message:

# MOTION FOR THE RETURN OF PROPERTY PURSUANT TO RULE 41(g) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND REQUEST FOR AN EVIDENTIARY HEARING ON THE MATTER

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.                                                    05-664 M-01 (JMF)

                                                      UNDER SEAL

ALL FUNDS ON DEPOSIT ON OR BEFORE
DECEMBER 19, 2005 IN REGIONS BANK ACCOUNT
NO. 6709194851, REGIONS BANK ACCOUNT
NO. 6709194878 and SUNTRUST BANK ACCOUNT
NO. 1000028078359, IN THE NAME OF GOLD & SILVER
RESERVE, INC., d/b/a OMNIPAY
*in rem,*

        Defendants.

## MEMORANDUM ORDER

### Introduction

On December 14, 2005, the government made application and I approved a warrant

allowing the government to seize "all funds on deposit in Regions Bank account number 67-

0919-4851, in the name of Gold and Silver Reserve, Inc." based on my initial conclusion that the

government had made a sufficient showing of probable cause to believe that defendants had

violated Title 18 U.S.C. § 1960,[1] the statute which makes it unlawful to operate an "unlicensed

money transmitting business." On December 27, 2005, Gold & Silver Reserve, Inc., d/b/a

Omnipay,[2] filed a petition to vacate the freeze on three accounts: 1) Regions Bank Account No.

6709194851, 2) Regions Bank Account No. 6709194878, and 3) SunTrust Bank Account No.

---

[1] All references to the United States Code are to the electronic version that appears in
Westlaw and Lexis.

[2] Hereafter "GSR."

1000028078359 and moved for an emergency hearing on its petition.

## The Parties' Arguments

At that hearing (and in their petition for a hearing), counsel for defendants argued strenuously that their client's business was not a "money transmitting business" and that, as a result of the seizure of the funds in the bank accounts, their client's business had been brought to a virtual standstill. Counsel for defendants also indicated that many of the business' clients were being severely harmed by virtue of their lack of access to their accounts. Finally, defendants also noted that not only had they willingly responded to numerous requests for information by various government agencies but that they had also engaged in multiple dialogues with interested government agencies, such as the Commodity Futures Trading Commission and the Internal Revenue Service, regarding the nature and appropriate regulation of their unique type of business.

The government countered that, pursuant to 18 U.S.C. § 981(a)(1)(A), the property "involved" in a transaction in violation of 18 U.S.C. § 1960 was subject to forfeiture, and that, pursuant to 18 U.S.C. § 981(b)(2), the government had a right to seize such property through the use of a warrant issued pursuant to the Federal Rules of Criminal Procedure. The government also argued that neither defendants' business nor their clients were being prejudiced in the manner alleged. The government further indicated that it was their intention to file a civil complaint within thirty days.

## The Power of the Courts to Consider Motions for Return of Property Prior to the Commencement of Forfeiture Actions

During the hearing, the government indicated that GSR could file a claim against the

2

seized assets once the government filed its civil forfeiture action.[3] While that is true, it is clear that the federal courts have asserted their jurisdiction over the assets seized prior to the commencement of the civil forfeiture action either under Rule 41(e) of the Federal Rules of Criminal Procedure or pursuant to their general equitable jurisdiction. See e.g., Marine Midland Bank v. United States, 11 F.3d 1119, 1125 (2d Cir. 1993) (noting that "we have reviewed the government's showing of probable cause prior to a full-fledged forfeiture trial" and indicating that courts in the Second Circuit "have ordered the return of seized property before the commencement of a forfeiture trial on the ground that the government lacked probable cause to seize the property at the time of the seizure."); United States v. Castro, 883 F.2d 1018, 1020 (11th Cir. 1989) (disagreeing that Rule 41(e) provides a remedy but indicating that the court has inherent equitable jurisdiction when, for example, commencement of civil forfeiture proceeding is unreasonably denied); Robinson v. United States, 734 F.2d 735 (11th Cir. 1984) (decision by same circuit that delay in commencing civil forfeiture proceeding authorized use of inherent equitable power to return seized property despite intervening commencement of civil forfeiture action), See United States v. Floyd, 860 F.2d 999, 1003 (10th Cir. 1988) (court may order return of seized property despite publication of notice of commencement of administrative forfeiture proceeding provided it finds "irreparable harm" from government's retention of the property). As an authoritative commentator has explained, the difference between exercising authority under Rule 41(e) and the court's inherent equitable jurisdiction is semantic and all of the courts agree that they may exercise their authority to require the return of the seized property prior to the

_____

[3] Note that there was also a reference to a continuing investigation and, incident to that investigation, search warrants have been issued and executed in Florida for books and records.

3

commencement or conclusion of the civil forfeiture action upon a showing either that the government has unreasonably delayed civil forfeiture proceedings or where the claimant may suffer irreparable harm from the government's continued retention of his property. David B. Smith, <u>Prosecution and Defense of Forfeiture Cases</u> ¶ 10.05A at 10-85-10-88 (1998).

However, no matter how the claimants attempt to secure the return of the seized funds, it is clear that I lack jurisdiction to consider it. Neither the controlling statute, 28 U.S.C. § 636, nor Local Rule 72.1, that defines the duties and powers I have, includes any provision that could possibly be construed to grant me authority to rule on GSR's motion. Indeed, 28 U.S.C. § 636(b)(1)(A) excludes from the matters that may be referred to a magistrate judge a motion to suppress evidence in a criminal case, the proceeding most closely analogous to the a motion for return of property. Instead, under the controlling statute, a magistrate judge has jurisdiction to consider such a motion only if a district court judge refers the motion to a magistrate judge to make findings of fact and conclusions of law. 28 U.S.C. § 636(b)(1)(B). Indeed, the only court that has ever considered the question has concluded that a magistrate judge lacks jurisdiction to consider a motion for the return of seized property and, at most, can only be permitted to submit proposed findings of fact and conclusions of law, <u>United States v. A Residence Located at 218 3rd Street, New Glarus, Wisconsin</u>, 622 F. Supp. 908, 911 (W.D. Wis. 1985),[4] <u>aff'd in part, rev'd in part on other grounds</u>, 805 F.2d 256 (7th Cir. 1986). Because there has not been any such designation by the Chief Judge, I conclude that I lack jurisdiction to consider GSR's petition.

---

[4] Note that this court has pointed out that the disposition of a motion for return of seized property "frequently requires factfinding, credibility assessment and the exercise of discretion." <u>Residence Located at 218 3rd Street</u>, 622 F. Supp. at 911. That is precisely what occurred here; the parties are bitterly divided on the fundamental mixed question of law and fact of whether GSR is in the money transmitting business.

I hasten to add that I have been concerned about the nature of the seizure sought in this case from the moment that warrant was presented to me. Among other matters, I was most specifically concerned that third parties would have their checks and other negotiable instruments dishonored if the seizure order issued. I was assured by government representatives that this would not occur. At the hearing, however, counsel for GSR consulted with his clients, the principals of GSR, and indicated to me that hundreds of its clients' negotiable instruments had been dishonored or were about to be. I am, therefore, referring this matter to the Chief Judge immediately.

JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated: 01/24/06

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Chambers of Magistrate Judge John M. Facciola
Suite 1426
333 Constitution Avenue, N.W.
Washington, D.C. 20001

TRANSMITTAL SHEET

To: Mitchell Fuerst + Andrew Ittleman

Fax No. (305) 371-8989

From: Chambers of Magistrate Judge John M. Facciola
United States District Court for the District of Columbia

Telephone: (202) 354-3130

Fax No. (202) 354-3132

Date: 1/3/06

Total Pages: 6

Message: Order issued under seal