UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : <br>    c/o United States Attorney's Office : <br>    Judiciary Center Building : <br>    555 4th Street, N.W. : <br>    Washington, D.C. 20530 : <br>       : <br>     Plaintiff, : <br>       : <br>     v. : <br>       : <br> ALL FUNDS SEIZED FROM OR : <br> ON DEPOSIT IN SUNTRUST : <br> ACCOUNT NUMBER 1000028078359, : <br> IN THE NAME OF GOLD AND : <br> SILVER RESERVE, INC. AND ALL : <br> FUNDS ON DEPOSIT IN REGIONS : <br> BANK ACCOUNT NUMBER : <br> 67-0919-4851, IN THE NAME OF : <br> GOLD AND SILVER RESERVE, INC. : <br>       : <br>     Defendants. : <br> _____: | Civil Action No. 1:05CV02497 <br> Before the Honorable <br> Rosemary M. Collyer |

### CLAIMANT GOLD & SILVER RESERVE, INC.'s REPLY TO THE PLAINTIFF'S OPPOSITION TO CLAIMANT'S MOTION FOR RELEASE OF SEIZED PROPERTY

COMES NOW, the Claimant, GOLD & SILVER RESERVE, INC., by and through its undersigned counsel, and files this reply to the plaintiff's opposition to the Claimant's motion for the release of seized property pursuant to 18 U.S.C. § 983(f).

**IN SUPPORT THEREOF**, **the Claimant respectfully submits to the Court:**

**A.  18 U.S.C. § 983(f) does not statutorily prohibit the release of seized funds.**

In the Government's opposition to the Claimant's motion for the release of seized property ("Government's opposition"), at p.5, the Government cites *United States v. Contents of Account 4000393242*, No.C-1-01-729 (S.D. Ohio Mar.13, 2002) (Dlott, J.) to support the contention that 18 U.S.C. § 983 statutorily prohibits the release of seized

Civil Action No. 1:05CV02497

funds unless those funds are the proceeds of *a legitimate business* that has been seized. That derelict decision, however, has not been followed in this or any other jurisdiction and should not receive the benefit of this Court's consideration.

In *United States v. Sampedro*, 227 F.Supp.2d 125, 129 (D.D.C. 2002) (decided *after* Judge Dlott ruled in *Contents of Account No.4000393243*), District Court Judge Paul Friedman denied the claimant's 983(f) petition because "Claimants have failed to carry their burden of demonstrating that these funds are the proceeds of a legitimate business…" In other words, although Judge Friedman denied the claimant's motion, Judge Friedman recognized that there was at least some burden that the claimant could have carried in moving for the release of its seized cash; *see also*, *United States v. Douleh*, 220 F.R.D. 391, 396 (W.D.N.Y. 2003) ("Seized currency…will not be returned to a claimant based upon a claim of hardship unless such currency is shown to be the assets of a legitimate business."); *United States v. Undetermined Amount of U.S. Currency...*, 376 F.3d 260, 265, n.4 (4th Cir. 2004) ("A court may, of course, order release of liquid assets – currency, monetary instruments, and electronic funds – which probably would not be available for return in precisely the same form. *See § 983(f)(8)(A).* But a court can only order the release of currency and the like if they constitute the 'assets of a legitimate business which has been seized.' *Id.* In this context, it seems unlikely the value of the currency would be 'lost'; rather, a 'legitimate business' would presumably use the currency to continue operating as a going concern. Accordingly, if a court ultimately ordered forfeiture, business assets would remain available to assure return to the government of an amount equal to the previously seized currency.")

Clearly, despite Judge Dlott's opinion, § 983(f) does not create a blanket statutory prohibition for the release of seized funds. Judge Dlott's unique, untested, and unpublished pocket holding should therefore not be followed by this Court in these tremendously important proceedings. Accordingly, as detailed at length in the Claimant's § 983(f) motion and the instant reply, by carrying the burden set forth in § 983(f)(1)(A-E) and (f)(8), the Claimant, Gold & Silver Reserve, Inc., is entitled to the immediate release of the seized funds in this case.

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com.

Civil Action No. 1:05CV02497

**B.    Because the Claimant has carried the burden codified in 18 U.S.C. § 983(f), the Claimant is entitled to the release of the seized funds in this case.**

18 U.S.C. § 983(f) provides for the release of seized property in certain circumstances:

(f) Release of seized property.

>   (1) A claimant under subsection (a) is entitled to immediate release of seized property if –
>
>   (A) the claimant has a possessory interest in the property;
>
>   (B) the claimant has sufficient ties to the community to provide assurance that the property will be available at the time of trial;
>
>   (C) the continued possession by the Government pending the final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as preventing the functioning of a business, preventing an individual from working, or leaving an individual homeless;
>
>   (D) the claimant's likely hardship from the continued possession by the Government of the seized property outweighs the risk that the property will be destroyed, damaged, lost, concealed, or transferred if it is returned to the claimant during the pendency of the proceeding; and
>
>   (E) none of the conditions set forth in paragraph (8) applies.

**1.    <u>18 U.S.C. § 983(f)(1)(A)&(B)</u>**

In this case, § 983(f)(1)(A)&(B) are plainly satisfied because the Claimant's possessory interest in the seized funds is unquestionable and the Claimant has sufficient ties to the community to provide assurance that the property will be available at the time of trial. Indeed, the Claimant presented these issues to the Court in paragraphs 6 and 7 of its § 983(f) motion filed on February 6, 2006 and the Government did not argue to the contrary in its opposition.

Civil Action No. 1:05CV02497

    **2.**    <u>**18 U.S.C. § 983(f)(1)(C)**</u>

18 U.S.C. § 983(f)(1)(C) provides that the Claimant must show that "the continued possession by the Government pending the final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as preventing the functioning of a business, preventing an individual from working, or leaving an individual homeless." In this case, although disputed by the Government, the Claimant's substantial hardships are the natural and proximate results of **a)** the freeze, seizure and arrest of the Defendant funds, and **b)** the Claimant's efforts to ameliorate the most egregious effects that the freeze, seizure and arrest of those funds *would have had* on the Claimant's loyal and innocent customer base. These hardships are clear and present and are fundamentally preventing the proper functioning of the Claimant's business.

    **a.**    **The Regions Bank account**

As the caption of this case makes clear, the Defendant funds were all contained in two separate bank accounts.[1] The first bank account, Regions Bank Account No. 67-0919-4851 served two primary purposes. First, the Claimant used that account to receive the numerous wires for InExchange orders made by the Claimant's customers on a daily basis. Second, the Claimant used that account to send wires in fulfillment of its customers' OutExchange orders on a daily basis.[2] When this account was frozen on December 19, 2005, it contained $499,754.09. However, although it was frozen, between

---

[1] The caption does not reveal, however, that the Claimant lost a third bank account as a result of these proceedings. Shortly after the freeze order was entered in this case, Regions Bank closed the Claimant's treasury account which the Claimants used to pay tax liabilities and employee retirement plan contributions. Consequently, the Claimant was unable to pay its retirement plan contributions or payroll taxes using the required payment methods. The IRS has thus notified the claimant that, because it was paying its taxes in an unauthorized manner (via money order), the Claimant would be penalized 25% per payment.

[2] The Claimant respectfully reiterates that any and all exchanges of currency for e-gold or e-gold for currency which passed through the Claimant's Regions account were conducted through bank wires which are fully regulated by the Bank Secrecy Act (BSA). The Claimant only accepts non-repudiable forms of payment (i.e., e-gold and bank wires) and is also not required to file currency transaction reports under 31 U.S.C. § 5313. Indeed, currency transaction reports are only required for payment methods where there is not necessarily any record of value changing hands (as with Federal Reserve notes).

Civil Action No. 1:05CV02497

December 19 and December 22, 2005, inclusive, two Automated Clearing House (ACH) credits totaling $0.55 and fourteen wires totaling $142,277.50 were credited to the account. On December 22, 2005, the Government seized $590,306.59 from that account.[3]

Between December 23, 2005 and January 13, 2006, inclusive, $10,000 was debited from the account via the Automated Clearing House (ACH) system[4] and an additional six wires totaling $73,953 were credited to the Claimant's frozen and previously-seized Regions Bank account.[5] On January 13, 2006 – the date of the last hearing before this Court – $115,678.55 was removed from the Claimant's Regions Bank account.[6] As such, every dollar that had accumulated in the Claimant's Regions Bank account *after* the original December 22, 2005 seizure of that account disappeared. The

---

[3] The Government's December 22, 2005 seizure was based on a December 20, 2005 intra-day balance. (Attached hereto as Exhibit 1 is a copy of the Regions Bank checking debit slip evidencing the first seizure of the Claimant's Regions Bank account).

[4] The Claimant assumes, in the absence of confirmation from Regions Bank, that the $10,000 debit was the result of the Claimant's pre-freeze rejection of a customer's attempt to send remittance for an InExchange order via ACH. (ACH is a type of repudiable payment which the Claimants, as a matter of course, do not accept.) The Claimant never attempted to move or otherwise affect the funds which the Government left over in the Regions Bank account once the freeze was in effect.

[5] The Claimant's officers and employees colloquially refer to these additional funds as "stragglers." These stragglers entered the Regions account contrary to the Claimant's efforts to stop them. In short, when a customer desires to exchange his currency for e-gold, he conducts that exchange over the Internet and receives a confirmation sheet that includes wiring instructions. The stragglers fell into two groups. The first group included customers who had placed an order prior to the freeze but did not send the wire until after the freeze and pursuant to the original wire instructions. The second group included customers who, because they were so accustomed to wiring to that particular Regions Bank account, sent their wires there as a matter of course and did not notice that the wiring instructions on the confirmation sheet had changed.

[6] Whether those funds were seized by the government or *sua sponte* turned over by Regions Bank remains a mystery to the Claimant. All that the Claimant has evidencing the turnover is a copy of a $115,678.55 Regions Bank debit slip which was issued to the United States Secret Service on January 12, 2006. Regardless of whether the Government seized those funds, it was unmistakably willing to accept them without notifying either the Claimant or undersigned counsel. (Attached hereto as Exhibit 2 is a copy of the Regions Bank checking debit slip evidencing the January 12, 2006 "seizure" of the Claimant's Regions Bank account).

total amount thus seized by the Government from the Claimant's Regions Bank account was $705,985.14.

### b. The SunTrust Bank account

The second bank account seized was SunTrust Bank Account No.1000028078359. Prior to the freeze and seizure, the Claimants used that account to issue checks in fulfillment of OutExchange orders and kept it solvent via periodic wires sent from the Regions account previously discussed.

Thursday, December 15, 2005 was an ordinary day for the SunTrust Bank account. On that date, $115,866.14 in checks cleared while no money entered the account. At the close of that business day, $112,912.32 remained in the account. Friday, December 16, 2005 was the day of the search and seizure at the Claimant's offices (and the home of Dr. Douglas Jackson) and was a most extraordinary day for the SunTrust account. Despite the fact that the account was backing in excess of two hundred outstanding checks, not one of those checks cleared. However, $30,000 managed to enter the account pursuant to a wire from the Claimant's Regions Bank account ordered earlier that day. Accordingly, at the close of the December 16 business day, $142,912.32 remained in the Claimant's SunTrust Bank account.

The Claimant's SunTrust Bank account was not actually seized until Tuesday, December 20, 2005. (Attached hereto as Exhibit 1 is a copy of the SunTrust Bank deposit account debit slip evidencing the first seizure of the Claimant's SunTrust Bank account). The total amount seized by the Government from the Claimant's SunTrust Bank account was $135,912.32.[7] Following the seizure, as the result of checks that cleared on December 20, the SunTrust account had a negative balance of ($2,542.54).[8]

---

[7] The Government's December 20, 2005 seizure of the Claimant's SunTrust Bank account was based on that account's December 19, 2005 closing balance. On Monday, December 19 and Tuesday, December 20, 2005, a total of $9,542.54 left the Claimant's SunTrust account. Of that amount, $847.54 was withdrawn by SunTrust for treasury management services unrelated to this case. The remainder left the account when three outstanding checks – in the amounts of $7,000.00, $1650.00, and $45.00, respectively – cleared. Following an in-house investigation, the Claimant has no explanation as to why these checks cleared. At the close of the December 20, 2005 banking day, more than two hundred checks remained outstanding.

  **c.**  **How the seizure of these accounts remains a substantial hardship**

    **i.**  **The financial hardships**

In sum, the Government seized $841,897.46 from the Regions and SunTrust bank accounts. That amounted to the loss of 68% of all of the Claimant's cash in banks at the time of the seizure. Such a huge percentage, *in and of itself*, was undisputedly a "substantial hardship" for the Claimant to endure. However, as a result of the very sensitive nature of the Claimant's business and financial responsibilities, that loss cannot be viewed in a vacuum. Indeed, the seizure of those accounts damaged hundreds of the Claimant's customers and then returned to the Claimant to impose its most lasting and devastating effects.

To be sure, as previously stated, the seizure of the Regions Bank account prevented the Claimants from sending and receiving wires, but did not stop additional incoming wires from being credited to the "frozen" account. Accordingly, if a customer, shortly before or during the freeze, had wired funds to the Claimant's Regions Bank account in exchange for the quantity of e-gold specified in an InExchange order, those funds were then locked inside the frozen Regions Account, *presumably* leaving the customer to be deprived of either the fulfillment (via e-gold) or refund (via wire) of the customer's InExchange order. This state of affairs – designed and undoubtedly anticipated by the Government – would have devastated the Claimant's unknowing customers.

However, the Claimant made every effort to eliminate or minimize damage to its customers. In the instances where the customer sent funds via wire to the Claimant's Regions Bank account expecting the account to be able to process the wire, the Claimant itself honored the obligation. In other words, when the customer wired funds to the Claimant's Regions Bank account in exchange for the quantity of e-gold specified in the customer's InExchange order, the Claimant honored its obligation by spending to that

---

[8] Following the freeze, the negative balance fluctuated on a daily basis. Each day, checks cleared only to be reversed due to insufficient funds on the following day.

customer the specified amount of the Claimant's own e-gold.[9] Each incoming wire to the frozen account thereby increased, in an equal amount, the balance of the frozen Regions account and the Claimant's losses.[10]

Similar losses took place relative to the Claimant's SunTrust Bank account. As previously stated, when the Government seized the Claimant's SunTrust account on December 20, 2005, in excess of 200 checks drafted from that account remained outstanding. (Again, these checks were one of the products of the Claimant's OutExchange service. If the customer wanted to pay his credit card company, his physician, or his insurance company using the Claimant's OmniPay service, the customer spends an agreed upon quantity of e-gold to the Claimant, the Claimant prepared a check on the customer's behalf from the SunTrust account, and the recipient of the check received it in due course.) Consequently, following the seizure, every single check presented for payment from that account bounced. Understandably, as checks began bouncing, the Claimant began receiving complaints. Rather than allowing those complaints to go unheard, the Claimant took it upon itself to refund the value of the bounced check to the customer using the Claimant's own e-gold. The customer was then forced to redeem the value of that e-gold elsewhere, and send his credit card company, his physician, or his insurance company a late check.[11]

---

[9] Indeed, as the Government has correctly noted, on January 20, 2006 the Claimant announced on its website that it "has continued to meet all financial obligations and remain completely operational." The Claimant, from the day of the seizure, has put its contracts ahead of its wallet and has made every effort to preserve the integrity, dignity and wellbeing of its clients.

[10] All loss figures cited in this reply, however, ignore the variety of miscellaneous expenses the Claimant has been forced to incur as a result of these proceedings. Some of these "collateral" expenses include but are not limited to increased phone bills (due to a spike in customer complaints phoned into the Claimant's 1-800 telephone number), increased wages (due to a spike in billed hours associated with resolving these administrative hardships), legal fees, travel expenses, and opportunity costs.

[11] Thus far, the Claimant has refunded 145 OutExchanges (via e-gold) in an amount totaling $233,947.74. Throughout this refund process, the value of gold continued to rise. Accordingly, so too did the Claimant's losses. To be sure, when a customer's check bounced and the Claimant refunded that customer the only way the Claimant could – i.e. with e-gold – the value of that e-gold at the time of the refund was greater than the value of the e-gold that was previously spent to the Claimant in exchange for an OutExchange

Civil Action No. 1:05CV02497

### ii.   Hardships relative to the loss of bank accounts

The Government's assertion that "[f]or over a month, G&SR has been permitted to move or otherwise affect any funds its customers may have deposited into accounts that G&SR controls" is patently false. First, on several occasions following the lifting of the freeze order entered in this case, the Claimants made efforts to return certain "straggler" wires to sender. However, the Claimants were told each time by Regions Bank employees that they were not permitted to do so. Additionally, counsel for the Government (John Roth, Esq.) has advised undersigned counsel that the Claimant would be committing a "continuing criminal act" by attempting to move or otherwise affect money contained in either of the seized accounts; see also, Government Opposition, at p.4: "the Government maintains that G&SR and its officers and directors violate the law each time they operate as an unlicensed money transmitter." As such, the Government's assertions cave in on themselves: on the one hand, according to the Government, the Claimants are "permitted" to affect those funds; on the other, the Claimants act criminally if they do.

As this Court is well aware, prior to the freeze order signed by Magistrate Judge Facciola, the Claimant completed *all* of its wire transactions using either FedWire or Swift. However, the freeze, seizure and arrest of the defendant funds eliminated the Claimant's ability to send or receive wires from American soil and have accordingly hamstrung the *proper* functioning of the Claimant's business; *see,* 18 U.S.C. § 983(f)(1)(C). As set forth in detail below, such hardship substantially outweighs any risk that the Defendant funds in this case will be "dissipated" upon release, and the Claimant is therefore entitled to the immediate release of the seized property in this case.

---

check. (Attached hereto as Exhibit 4 is data displaying the rise in the price of gold between November of 2005 and February of 2006. On November 1, 2005, the price of gold was $469.97 per ounce. On February 25, 2006, the price of gold was $554.66 per ounce; *see also*, www.oanda.com).

9

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI  FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com

Civil Action No. 1:05CV02497

> **3.    18 U.S.C. § 983(f)(1)(D): The Claimant's hardships far outweigh the risk that the defendant funds will be "dissipated" upon release.**

The Government has put words into the mouth of the Claimant. In the § 983(f) petition, at p.3, ¶ 8, the Claimant stated that "the Government's continued control over the contents of the Claimant's bank accounts is very seriously harming the Claimant and the Claimant's customers." The Claimant also stated that "[b]ecause the Claimant is still unable to complete the wire transactions that allow its business to operate, many of its customers continue to suffer the grievous effects of bounced checks and other forms of non-payment." However, the Claimant never conceded and did not purport to concede that "the seized funds will not be available for forfeiture should they be released now." *See*, Government's Opposition, at p.2. That statement is entirely false.

Without question, the Claimant's hardships relative to the freeze, seizure and arrest of the defendant funds have been substantial and will not subside unless and until they are returned to the Claimant. What this Court must now consider is whether that continued hardship will outweigh the risk that the funds "will be destroyed, damaged, lost, concealed, or transferred if [they are] returned to the claimant during the pendency of the proceeding." In this case, the Claimant respectfully submits that **a)** because there is no risk that the seized funds will be destroyed, damaged, lost, concealed or transferred if returned to the Claimant, and **b)** because the hardship to the Claimant in this case is so severe, the hardship to the Claimant necessarily outweighs any risk of the loss of those funds. Accordingly, the funds should be returned to the Claimant.

The hardships related to the freeze, seizure and arrest of the defendant funds are fully briefed and need not be repeated in this section of this reply. Suffice it to say that those hardships are substantial. The Claimant's efforts to honor its obligations to its customers while engaged in these proceedings and without the benefit of 68% of its cash or the use of an American bank account has brought the Claimant to its knees. It is unclear at this time whether the Claimant can continue operating in such a fashion. If it can at all, for how long the Claimant can continue operating is also unclear. All that is certain is that the Government's continued possession of the defendant bank deposits

Civil Action No. 1:05CV02497

pending the final disposition of forfeiture proceedings will "prevent the functioning of [the Claimant's] business" and thereby satisfy 18 U.S.C. § 983(f)(1)(D).[12]

Those substantial hardships outweigh the risk that the defendant funds will be dissipated. Indeed, due to the very nature of the Claimant's business, it would simply be impossible to dissipate those funds. To be sure, the funds seized from the Claimant's Regions Bank account were used in the fulfillment of InExchange and OutExchange orders; similarly, the funds seized from the Claimant's SunTrust Bank account originated in the Claimant's Regions Bank account and backed the checks issued as part of the Claimant's OutExchange services. To perform an InExchange, a customer wires the Claimant's Regions Bank account and receives a certain amount of e-gold in return. To perform an OutExchange, a customer spends a certain amount of e-gold to the Claimant and receives either a wire or check in return. In other words, value cannot exit the Claimant's system without value entering it.[13] Hence, assuming *arguendo* (as the Government certainly does) that "G&SR wants the funds so it can wire them to others," those outgoing wires would only occur following a corresponding increase in the Claimant's e-gold reserve. Accordingly, there is no risk of "dissipation" in this case. The value of the funds in the Claimant's arrested bank accounts will most assuredly be available for forfeiture should this matter proceed to trial. Accordingly, the Claimant's ongoing hardships plainly outweigh the 0% chance that the defendant funds will be dissipated should they be returned to the Claimant at this time.

---

[12] *See,* David B. Smith, *Prosecution and Defense of Forfeiture Cases*, § 8.02A Hardship Release of the Property Under 18 U.S.C. § 983(f): "Congress recognized that even where a claimant prevails in forfeiture litigation, he can be irreparably injured by the loss of use of his property during civil forfeiture litigation and, indeed, before the government files suit. Moreover, in such cases the continued possession of the property by the government gives it unfair leverage in extracting a quick settlement from the owner." *Citing,* H.Rep.No. 106-192, 106th Cong., 1st Sess. 17 (1999) ("In cases such as this even when the government's case is extremely weak, the owner must often settle with the government and lose a certain amount of money in order to get the property back as quickly as possible.")

[13] InExchanges and OutExchanges are not transfers. InExchanges and OutExchanges are "buys" and "sells" of liability contracts.

RODRIGUEZ O'DONNELL ROSS FUERST GONZALEZ WILLIAMS & ENGLAND, P.C.
TWENTY ZERO TWO ♦ 1001 BRICKELL BAY DRIVE ♦ MIAMI FLORIDA 33131
PHONE 305-350-5690 ♦ FAX 305-371-8989 ♦ E-MAIL mfuerst@rorfgw.com.

Civil Action No. 1:05CV02497

**4.     18 U.S.C. § 983(f)(1)(E): None of the conditions set forth in paragraph (8) of § 983(f) applies in this case.**

18 U.S.C. § 983(f)(8) provides that, in certain cases, seized property is *never* to be returned to a claimant seeking its pre-trial return. Indeed, 18 U.S.C. §983(f) does not apply if the seized property —

> (A) is contraband, currency, or other monetary instrument, or electronic funds unless such currency or other monetary instrument or electronic funds constitutes the assets of a legitimate business which has been seized;
> (B) is to be used as evidence of a violation of the law;
> (C) by reason of design or other characteristic, is particularly suited for use in illegal activities; or
> (D) is likely to be used to commit additional criminal acts if returned to the claimant.

At this time, the Claimant respectfully offers the Court two final points which are central to this case and the instant request. First, the property seized by the Government in this case was *pure value* – the fungible representation of money contained electronically in two bank accounts. The Government did not seize cash, Federal Reserve notes, anything that may be used as "evidence of a violation of the law," or anything that is "particularly suited for use in illegal activities." As previously stated, the funds seized from the Claimant's bank accounts were used to process the InExchange and OutExchange orders that form the foundation of the Claimant's business.

Secondly, what § 983(f)(8)(A) provides – by deduction – is that if the assets of a *legitimate business* have been seized, those assets should be returned to the Claimant if the Claimant carries the remainder of the burden set forth in § 983(f). In this case, **the Claimant is a legitimate business and the Government has not alleged otherwise.** To be sure, although the Government has attempted to allege that the Claimant has acted as an unlicensed money transmitting business in violation of 18 U.S.C. § 1960,[14] its words

---

[14]   For reasons set forth in detail in the Claimant's motion to dismiss and the Claimant's motion for the return of seized property, the Government has not and cannot successfully plead a § 1960 violation in this case.

12

Civil Action No. 1:05CV02497

only attack the Claimant's *lawfulness*, not the Claimant's *legitimacy*.[15] The Claimant does not deal in illicit wares and does not engage in money laundering or racketeering activities of any kind. Its practices, in and of themselves, are perfectly legitimate. Moreover, because it is not a money transmitting business (unlicensed or otherwise), its practices are perfectly lawful as well. The funds seized from the Claimant's two bank accounts were those of a legitimate and lawful business, and § 983(f)(8) is therefore inapplicable in this case.

## CONCLUSION

The Government has not and cannot articulate that the Claimant is a money transmitting business as that term is defined by statute; *see,* 18 U.S.C. §1960 and 31 U.S.C. §5330. Nevertheless, due to slanderous allegations it made and subsequently withdrew, the Government took control of the Claimant's bank accounts and business and is currently attempting to choke the Claimant into submission. Should this Court deny the Claimant's request for the return of its seized property, there exists a very strong likelihood that the Government may succeed in doing so. Albeit unfairly, these proceedings would be rendered moot. The bandages that the Claimant has placed over the wounds in its hemorrhaging business were not designed to be permanent, and they are being stretched towards their breaking point with every passing day.

That being said, the Claimant has displayed in its pleadings that it carries the burden articulated in 18 U.S.C. § 983(f) and is therefore entitled to the immediate return of its seized property. The Claimant has an unquestionable possessory interest in the seized funds and has sufficient ties to the community to provide assurance that the funds will be available at the time of trial. Such ties are vividly evidenced by a nine year history of good faith relations with Federal agencies both within and removed from the Treasury Department. Furthermore, because the Claimant's suffering as the necessary and proximate result of the Government's possession of the defendant funds is so great, and because it would be impossible for the defendant funds to "dissipate" if returned to the

---

[15] Congress's use of the terms "violation of the law," "illegal," and "criminal" in § 983(f)(8) clearly evinces its intent to speak of something that is "illegitimate" in a very different light.

13

Civil Action No. 1:05CV02497

Claimant at this time, the Claimant's suffering outweighs the risk of dissipation. Lastly, the defendant funds are the assets of a legitimate business, earned in relation to the Claimant's business of purchasing and selling liability contracts on the open market. The burden set forth in § 983(f) is thus carried, and the Claimant is therefore entitled to the return of the Defendant funds at this time.

      WHEREFORE, for the foregoing reasons, the Claimant, GOLD & SILVER RESERVE, INC., respectfully requests that this Court enter an order releasing the seized property in this case to the Claimant at this time.

                                          Respectfully Submitted,

                                      /s/ *Andrew S. Ittleman*
                                      Mitchell S. Fuerst, Esq.
                                      Florida Bar No. 264598
                                      Andrew S. Ittleman, Esq.
                                      Florida Bar No. 802441
                                      Rodriguez O'Donnell Ross Fuerst
                                       Gonzalez Williams & England, P.C.
                                      1001 Brickell Bay Drive, Suite 2002
                                      Miami, FL  33131
                                      305-350-5690 (o)
                                      305-371-8989 (f)
                                      Carlos Rodriguez, Esq.
                                      District of Columbia Bar No. 935692
                                      1211 Connecticut Ave. N.W., Suite 800
                                      Washington, DC 20036
                                      (202) 293-3300 (o)
                                      (202) 293-3307 (f)

Civil Action No. 1:05CV02497

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

**CLAIMANT GOLD & SILVER RESERVE, INC.'s REPLY TO THE PLAINTIFF'S OPPOSITION TO CLAIMANT'S MOTION FOR RELEASE OF SEIZED PROPERTY**

was served on February 28, 2006 via electronic mail upon John Roth, Esq. (john.roth2@usdoj.gov), Chief, Fraud & Public Corruption Section of the United States Attorney's Office in Washington, D.C. and Assistant United States Attorney Bill Cowden (william.cowden@usdoj.gov).

*/s/ Andrew S. Ittleman*
Mitchell S. Fuerst, Esq.
Florida Bar No. 264598
Andrew S. Ittleman, Esq.
Florida Bar No. 802441
Rodriguez O'Donnell Ross Fuerst
 Gonzalez Williams & England, P.C.
1001 Brickell Bay Drive, Suite 2002
Miami, FL  33131
(305) 350-5690 (o)