IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x
                              :
UNITED STATES OF AMERICA      :
                              :
    vs.                       :   Docket No. 05-0664M-01(CR)
                              :
ALL FUNDS ON DEPOSIT ON OR    :
BEFORE DECEMBER 19, 2005 IN   :
REGIONS BANK ACCOUNT NO.      :
6709194851, REGIONS BANK      :
ACCOUNT NO. 6709194878 AND    :
SUNTRUST BANK ACCOUNT NO.     :
1000028078359 IN THE NAME OF  :
GOLD & SILVER RESERVE, INC.,  :
d/b/a OMNIPAY, in rem,        :
                              :
        Defendants.           :
                              :   Washington, D.C.
- - - - - - - - - - - - - - -x   December 29, 2005


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:      LAUREL RIMON, ESQ.
                         KIMBERLY PERETTE, ESQ.
                         Assistant United States Attorney

For the Defendant:       CARLOS RODRIGUEZ, ESQ.
                         ANDREW ITTLEMAN, ESQ.
                         MITCHELL FUERST, ESQ.


**Proceedings recorded by the Court, transcript produced by Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307, Washington, D.C. 20005, 202-347-5395, www.pro-typists.com**
M1261/bf

```
 1                P R O C E E D I N G S

 2          THE CLERK:  This is Criminal Case 05-664M,

 3   United States versus All Funds on Deposit in Regions Bank

 4   Accounts in the name of Gold & Silver, Incorporated.  This

 5   is a sealed matter.  This is a motions hearing.  Will all

 6   parties please identify themselves for the record, and the

 7   parties you represent, beginning with the Plaintiffs.

 8          MS. RIMON:  Good morning, Your Honor.  Laurel

 9   _____ Rimon with the U.S. Attorney's Office for the

10   United States.

11          MS. PERETTE:  Good morning, Your Honor.  Kimberly

12   Keifer Perette, with the Criminal Division of Department of

13   Justice.

14          MR. DODSON:  Good morning, Your Honor.  Roy

15   Dodson with the United States Secret Service.

16          THE MAGISTRATE JUDGE:  Good morning, Agent

17   Dodson.

18          MR. RODRIGUEZ:  Your Honor, Carlos Rodriguez.

19   I'm joined as counsel for this proceeding, I'm a member

20   in good standing of this Court, and I think yesterday Your

21   Honor ruled in allowing Mr. Mitchell to participate, and

22   I would ask now that Your Honor address the same motion

23   pro hac vice for our Mr. Ittleman, so that he can

24   participate, as well.

25          THE MAGISTRATE JUDGE:  The motion is granted.
```

1          MR. FUERST:  Good morning, Judge.  My name is

2    Mitchell Fuerst.  I'm here for the Respondent.

3          THE MAGISTRATE JUDGE:  Okay.  Now, Mr. Fuerst,

4    you're a member of the Florida bar as well as the bar of

5    this Court, or just of the Florida bar?

6          MR. FUERST:  I'm a member of the Florida bar.

7    I'm not a member of this Court, although I have been

8    granted pro hac vice status before this Court on prior

9    occasions.  I have Mr. Ittleman with me.

10          MR. ITTLEMAN:  Good morning, Your Honor.  Andrew

11    Ittleman from Rodriguez, O'Donnell, Ross and Fuerst, on

12    behalf of the Respondent.

13          MR. FUERST:  Your Honor, behind the bar I have my

14    partner, Mr. England --

15          THE MAGISTRATE JUDGE:  Good morning, sir.

16          MR. FUERST:  -- another lawyer in my office,

17    Ms. Janeta??? --

18          THE MAGISTRATE JUDGE:  Ms. Janeta???.

19          MR. FUERST:  -- Mr. Barry Downey, who is an

20    attorney for the principal of Gold & Silver Reserve, and

21    Dr. Jackson, also a principal of Gold & Silver Reserve.

22          THE MAGISTRATE JUDGE:  Thank you very much.  If

23    you'll all be seated.  As I promised you last night, since

24    the Government proceeded ex parte I'm concerned about the

25    imbalance of information.  So if I can, I would just like

1   to review the history of this, what happened.

2         As you know, magistrate judges are assigned to

3   criminal matters on a monthly basis, and December is my

4   month.  One day, and I don't remember exactly when it was,

5   but it would have been the day before I issued the order,

6   at about 4:00 o'clock in the afternoon, Mr. Cowan and Agent

7   Dodson and another person -- I don't know who that person

8   was, but another representative of the Department of

9   Justice -- brought this application to me.

10         In the ordinary course, I would review it on the

11   spot and sign it or not sign it.  But in that particular

12   instance I immediately expressed to Mr. Cowan my concern

13   with this matter, because it seemed to be a quite unusual

14   matter.  I advised Mr. Cowan that I would not sign it

15   immediately, but I would give it thought over the evening.

16   And that evening and the next morning I considered the

17   statutory authority which was cited, which was 18 U.S.C.,

18   1981, and the concomitant statute, 1960, which is the

19   federal legislation pertaining to what the statute

20   describes as a money-transmitting business.

21         I remained concerned about this matter and placed

22   a phone call to the gentleman who I believe is the chief of

23   the Fraud Division, what used to be the Fraud Division, at

24   the U.S. Attorney's Office, and expressed some concerns

25   about this.  My concerns took several different forms.

1          The first concern I had was -- although not

2     primary in my thinking, but the one that first came to mind

3     -- was whether there would be innocent third parties at

4     the other end of this transaction who, by virtue of the

5     Government's action, would be unable, for example, to have

6     their checks honored by the merchants and others to whom

7     they gave them because of the absence of funds to cover

8     them.  I was assured by Mr. Cowan that that was not a

9     concern.

10          The Government then explained to me, as Mr. Steve

11    Bernell had done earlier in the day, that, oddly enough,

12    this investigation into the activities of Gold & Silver

13    Reserve had come about as a branch or as a part of an

14    investigation into child pornography, as I understood it.

15    The services were being used to pay for this child

16    pornography anonymously.

17          I then had a conversation with those two

18    gentlemen and expressed those concerns.  Mr. Bernell,

19    if my memory serves me right, was on the phone, as was

20    Mr. Holt and Mr. Cowan and another person, and I expressed

21    those concerns.  I also expressed concerns about the

22    legitimacy of the enterprise.

23          I explained to them, as I will explain to you,

24    that it was reminiscent to me of an instrument that I

25    myself have used at one point in my life.  There was a

1   point in the 1980s, I guess it was, when interest rates

2   went through the roof, and Merrill Lynch had an account in

3   which monies were invested into money market certificate --

4   I'm sorry, into municipal bonds, so that the interest that

5   was gained on one's money market account that was used in

6   the ordinary course to pay one's mortgage, that escaped

7   taxation.

8           And I explained to these gentlemen that I didn't

9   quite understand why, if I understood the situation

10  correctly, why there was any governmental concern about an

11  instrument that struck me as being fairly common in the

12  marketplace.  That is, I could conjure up a situation in

13  which a gentleman in Argentina, for example, who was a

14  merchant, would buy goods from France.  Since in Argentina

15  his currency might be fluctuating wildly, I could

16  understand why the merchant in France would be unwilling to

17  be paid in pesos, and therefore would be willing to be paid

18  in an international instrument like this.

19          At that point, the Government -- I don't remember

20  if they exactly agreed or disagreed with my analogy or

21  found it insufficient, but nevertheless indicated that they

22  had some concerns that unless the Court took immediate

23  action that the funds at issue would be dissipated, and

24  therefore on balance it seemed to them more appropriate

25  that the monies be placed in escrow where they could not be

1    dissipated until a Court could take action.

2         Since I was proceeding ex parte, I asked Mr. Holt

3    to please give me a letter in which he explained what he

4    had explained in the phone call, because I anticipated a

5    day like today would come.  Such a letter arrived in my

6    chambers.  I did not read it.  I just read the first

7    sentence of it, which indicated that Mr. Holt said that

8    because he was about to discuss investigative matters he

9    asked for me to consider it to be privileged under the

10   attorney-client and work product privileges.  That is all

11   I remember of the letter.  I don't remember specifically

12   reading it.  My clerk has told me that she has read it.

13   I have directed her to take the letter, seal it, and put it

14   an envelope.

15        So that brings everyone up to date.  The next

16   thing that happened, as I explained yesterday, was that we

17   received a phone call, I believe from Gold & Silver

18   Reserve.  I was in New York visiting my family for the

19   holidays, and Ms. Podger and I chatted.  She indicated that

20   she had got a call from your firm, Mr. Rodriguez, I

21   believe, indicating that you were going to be involved in

22   the matter.

23        And as I explained yesterday, a young lady

24   arrived at our office and explained to us that you had not

25   received the documentation that was pertinent here.  As you

1    now know, I was concerned about that, and pursuant to the

2    order I issued yesterday I directed that the affidavit be

3    given you.

4         As you've noticed from its copy, I expurgated

5    that portions of it that I thought could be described as

6    investigative, but frankly, on the basis of the expurgated

7    -- a comparison of the expurgated and unexpurgated version

8    shows that I didn't delete all that much, so I think you

9    now have the Government's theory of prosecution and what

10   the case is all about.  I hope that corrects the imbalance

11   of information.

12        If you have any questions personally of me you

13   wish to ask about those transactions, please do so now so

14   you can make your argument on the basis of a fully informed

15   record.

16        MR. FUERST:  Judge, I don't have any questions

17   based upon what you've said but, in fact, what you have

18   said allows me to start my argument when you're ready.

19        THE MAGISTRATE JUDGE:  Please.

20        MR. FUERST:  Would you like me to approach the

21   bench?

22        THE MAGISTRATE JUDGE:  Would you, please.

23   We have here, counsel -- we're very high-tech here in

24   Washington, D.C., so we have a recording system that is

25   operated by the sound of your voice, but if you come to the

1  podium it's that much better a record.

2         MR. FUERST:  Judge, what I would like to do is

3  start with -- and going through the questions that you

4  asked, I'd like to start in a very particular place, and

5  then I'm going to get right to your questions and then I'm

6  going to get into the law and what really transpired here.

7         I pass up to the Court -- Andy, would you share

8  this with opposing counsel?  May it please the Court.

9         Judge, this is a list, 295 entries of summonses,

10  subpoenas, requests for information.  On the first page,

11  you'll see, at line number 29, these are chronologically

12  subpoenas, summonses, requests for information, served upon

13  Gold & Silver Reserve for data regarding transactions

14  undertaken -- actually, these summonses and subpoenas were

15  served on e-gold, but they are processed through Gold &

16  Silver Reserve, for information regarding transactions

17  undertaken by people who have e-gold accounts.

18         The first 28 are information document requests,

19  summonses or subpoenas served naming Gold & Silver Reserve

20  or e-gold or Dr. Jackson or Mr. Downey for specific

21  information regarding them; in the course of routine

22  government, in the 29 and below, investigations of other

23  people; and in 1 through 28, routine government

24  examinations or investigations of the activities of Gold &

25  Silver Reserve and e-gold in respect to their business

1 | operations.

2 | I would point out to you that Item number 1, Item
3 | number 3, Item number 2, are from the Bank Secrecy Act
4 | Audit Group of the Internal Revenue Service. I will note
5 | that in the grand jury -- excuse me, in the search warrant
6 | that was served out of the Middle District of Florida, the
7 | documents that have been gathered to respond to the Bank
8 | Secrecy Act Group's normal, routine examination of this
9 | company for compliance with the anti-money laundering laws
10 | made up of the Patriot Act and the Bank Secrecy Act and
11 | various other statutes, all of which we have before us
12 | today, have been under routine examination by the
13 | government. Nary a word ever said that, "You are in
14 | violation of federal law in how you conduct your business."

15 | The documents that I am due to produce to those
16 | agencies in the normal civil examination are due on January
17 | 6th. I will be going to the Middle District and asking the
18 | Judge there to get us back the records so we can respond to
19 | the normal examination requests for now what we are accused
20 | of as being criminal activity.

21 | I will point out to you that, in addition to
22 | these requests, many of them were made by the Secret
23 | Service. In fact, I'm going to pass up to the Court a
24 | string of e-mails between my client and the Secret Service
25 | over the course of a year's period of time, trying to

1    arrange and sit down and have a meeting so that my client

2    could explain its business to the Secret Service to enable

3    the Secret Service to more readily ascertain information

4    that it needed.  So the suggestion that this business

5    activity provides for anonymity in the purchase and sale of

6    child pornography is such an absurd and ludicrous posture

7    to take that it could only come from someone who is

8    intentionally blind to the facts.  So here's how those

9    facts work.

10           If you wanted to have an e-gold account for the

11   very reason that you articulated, a company in Argentina

12   maybe buying something from somebody in France.  Somebody

13   in France maybe selling something to somebody in Russia.

14   And they want to use, as the medium of exchange, e-gold.

15   How do they do that?  Well, you can open an e-gold account,

16   but that doesn't mean you put any money into it.  You go

17   into the Web site, you create the e-gold account, and now

18   you have to get e-gold value into that account.  Well,

19   there's two ways to do that, essentially.

20           There is a universe of people who have e-gold and

21   e-gold accounts.  One of them might be a lawyer who needs

22   to buy paper to print out documents to give to a Federal

23   Court and Staples may accept e-gold as a means of payment,

24   and so he clicks e-gold from his account over to Staples,

25   and Staples acknowledges payment and delivers the paper.

1          Well, where did the lawyer get e-gold?  Well, the

2     lawyer may have gotten e-gold because a client may have had

3     an e-gold account and clicked e-gold from the client's

4     account to the lawyer's account.

5          Well, somewhere this e-gold must be minted.

6     It must be created.  Otherwise, it's just a promise-to-pay

7     system.  It is the same promise-to-pay system that is

8     essentially U.S. legal tender.  But e-gold doesn't operate

9     on a promise to pay.  It operates on a basis of

10     instantaneous confirmation of payment.  So how does that

11     happen?

12          Well, if you want e-gold so that you can buy the

13     paper to file the document, you need to go to what's called

14     an InExchange.  You need to buy an e-gold liability.

15          E-gold, the special purpose trust that has all

16     the bullion, how does it sell it to you?  It can't converse

17     with you.  So it goes to Gold & Silver Reserve and says,

18     "We're going to wire, through the federal banking system

19     and only through the banking system, we're going to wire to

20     you a thousand dollars."  And we're buying -- not

21     exchanging, not transferring, not converting -- we're

22     buying an e-gold liability.  And Gold & Silver Reserve

23     sells that liability.  How did they get it?

24          Well, they bought Good London Exchange gold and

25     sold it to e-gold.  And what did they get from e-gold?

 1  They got e-gold credits in an account they established.

 2          So now you go to Gold & Silver Reserve and you

 3  send them a thousand dollars through a federal bank.

 4  Gold & Silver Reserve clicks a thousand dollars' worth of

 5  e-gold into your e-gold account.  That e-gold stays in your

 6  account until you click it someplace else.  But the moment

 7  you try to take it out of that closed circle of e-gold,

 8  you have to go through Gold & Silver Reserve or another

 9  exchange, another company like Gold & Silver, to buy --

10  what?  Your e-gold liability asset.

11          You have e-gold guaranteed by a bullion, audited

12  by the CFTC, acknowledge that the bullion exists.  The

13  bullion is audited and is available on the Web site.  You

14  can see the bars, the delivery dates and all that

15  information.  And you therefore know that that exists.

16  It's not a credit card, it's not electronic currency, it's

17  not electronic debits and credits.  It is an instantaneous

18  exchange of value.

19          Now.  Every transaction outside of that loop goes

20  through a federal banking system.  Now, conceivably it's

21  possible that there is a bank in France where the Argentine

22  customer is now going to buy something and click his e-gold

23  over to the French account, and the French account says,

24  "Well, we need to buy steel.  And in order to make what

25  we're going to make, we need to have steel.  We have

1    e-gold, but the place that we buy steel from doesn't accept

2    e-gold.  So what do we do?"

3        Well, the French company now has to sell the

4    e-gold liability that it has, the contractual liability.

5    And who does it sell it through?  It sells it through

6    Gold & Silver Reserve.  And Gold & Silver Reserve pays that

7    French company in -- right now, it'd be euros.  How does it

8    do that?  Through the banking system.  By issuing a check.

9        However, that e-gold that has traveled, it

10   entered the system and it's traveled around the system, is

11   not anonymous.  It's never been anonymous.  From the moment

12   that minted gold got in there, through all the parties who

13   could have clicked it here or there, the client to the

14   lawyer, the lawyer to the paper company, the paper company

15   to the shareholder, the shareholder to somebody else, and

16   around and around and around, is in a database.  And that

17   database exists in e-gold and there is no anonymity.  It is

18   a permanent digital record of every transaction.

19       So when the Government served a search warrant to

20   gather the data, it was amazing that the task force that

21   they brought in to do it expected to be at Gold & Silver

22   Reserve for eight hours, when in fact they were there for

23   36 hours.  Why?  Because the data from 1995 exists.  Every

24   transaction, ever, at any point in time, is always there.

25       So the concept of somebody -- if they really want

1  to know who is buying child porn with e-gold?  All they

2  have to do is ask the question.  Because if they identify

3  the site where the payment went, "Here is the child porn

4  seller," we could track the e-gold transactions back to the

5  day that the e-gold was minted.  And we can track every

6  transaction that that e-gold account and every e-gold

7  account ever touched by that e-gold credit ever went to.

8  So it was not anonymity that they were seeking.

9       And I would again submit to you that this

10  request, every single one fulfilled, nary a complaint,

11  no Judge ever said, "Bring those people in here."  No U.S.

12  Attorney ever said, "I need you to come testify."  No

13  Secret Service agent, no FBI agent, no Internal Revenue

14  agent, no Customs agent, no Postal Inspector agent, ever

15  said, "Your data was inadequate."  This is only the list

16  since 2003.  And every single request was honored, and

17  every single request was honored within days.

18       I've last honored two weeks ago a request from

19  the Middle District when the Federal Republic of Russia

20  requested the Middle District U.S. Attorney's Office to get

21  data on a transaction that they believed involved a

22  terrorist operation, and they wanted to know who were the

23  participants because e-gold seemed to be flowing in.  We

24  responded within a day's time.  We gave them all the data

25  that they requested.  So anonymity can't be the issue.

1          Dissipation of the funds.  Well, the point of

2   fact is that the funds are being dissipated.  It's being

3   dissipated by the effect of this Court seizure, and I'll

4   tell you why.  Because in a perfect world every customer --

5   and there are 23,000 active e-gold accounts with e-gold

6   value in them, people who are buying Christmas presents --

7   I want to point out to the Court the average transaction of

8   an e-gold transaction is around $43.00 U.S.  We're not

9   talking about great sums of money here.

10          We're talking about people who believe that this

11  is a means by which they protect their money and they

12  protect the value of what they own, and appreciated this

13  year, 20 percent increase in the value of gold this year,

14  and enjoyed that participation, but didn't get to use it

15  for Christmas.  But of those 23,000 accounts, how will they

16  get their money out now?  How do they get their value of

17  e-gold out?

18          Well, they can click it to other people, but if

19  any of those people want to remove e-value, e-gold value,

20  they have to go through an exchange.  Well ,here's the

21  exchange.  The exchange has been locked.

22          THE MAGISTRATE JUDGE:  The exchange is these two

23  trust accounts?

24          MR. FUERST:  Yeah.  It's locked.  The money can't

25  get out.  Okay, there are other accounts elsewhere -- in

1    Estonia.  But an American, an Argentine, a U.K. person --

2    there's no reason for the transaction to go that way, but

3    let's take it one step further.  Why is it locked?  What is

4    the criminal act that the Government is alleging?  The

5    Government is alleging 1960.  Well, 1960 requires that we

6    violate 31 U.S.C., 5330.  But we don't.  Which is why, in

7    the face of a year-and-a-half's examination by the Internal

8    Revenue Service there has not been a determination that

9    anybody is in violation.  So let's go through 5330, just

10   for a moment, Judge, and see --

11             THE MAGISTRATE JUDGE:  Please hand it up to me.

12   This is only the Criminal Code.  I don't have that section.

13   Oh, thank you very much.  I have it, counsel.

14             MR. FUERST:  1960 says that "whosoever knowingly

15   conducts or controls," and it talks about "an unlicensed

16   money transmission business."  Okay?  And then it cites to,

17   in (b)(1)(B), "fails to comply with the money transmission

18   business registration requirements of 5330 of Title 31."

19   So that's the opening predicate, 5330, Title 31.

20             So, 5330, Title 31 (a), registration in general,

21   "any person who owns or controls a money transmitting

22   business shall."  Okay?  So in order to understand what a

23   money transmitting business is, we turn to definitions.

24   Which is subparagraph (d).  What's a money transmitting

25   business?  Well, we now have three phrases.  1(a), and I'm

1    going to skip 1(a) for a minute -- we're going to get back

2    to that -- but I want the Court to see that this is a

3    conjunctive phrase: 1(a) and (b) and (c).

4            Now, (b) is "required to file reports under

5    Section 5313."  31, U.S.C., Section 5313.  Well, 31,

6    U.S.C., Section 5313, "All currency transaction reports,

7    $10,000.00 in cash or currency, must file a report with the

8    Department of the Treasury."

9            Gold & Silver Reserve does not accept cash.

10   Gold & Silver Reserve does not accept third-party bearer

11   instruments.  Gold & Silver Reserve does not accept

12   fungible.  Gold & Silver Reserve accepts only one thing --

13   a wire transfer.  So it is not a 5313 organization.  It

14   doesn't have currency receipts, it doesn't file currency

15   transaction reports, it is not required to do so by the

16   Secretary of the Treasury or by any regulations promulgated

17   by the Secretary of the Treasury; therefore, by definition,

18   without going any further, we know that 5330 doesn't apply,

19   because are not a money transmitting business, because we

20   have to meet all three criteria of a money transmitting

21   business.  We don't meet one of them immediately.

22           (c), "is not a depository institution."  We are

23   not a depository institution.  We are in the business,

24   not unlike the Crowne Gold case, 47 bars of 10-ounce gold,

25   I refer to as the "47/10 case," we sell -- we don't

1  exchange, we don't convert -- we sell e-gold liabilities.

2  We sell them against the currency that we are paid, but we

3  don't accept currency.  We accept electronic transfer only,

4  through Fed Wire's system, a value.  So we're not a

5  depository institution and we don't accept currency.  So

6  we're not (b) and we're not (c).  So again, we can't be

7  5330.  If we're not 5330, we're not 1960.

8         If the Court wants to look at (a) -- I'm not sure

9  we need to go to (a) but I'm going to do that anyway,

10  because it's a conjunctive phrase -- "provides check

11  cashing."  We do not cash checks.  We sell liability

12  contracts.  "Currency exchange."  We do not exchange

13  currency.  We do not receive currency, we do not pay out

14  currency.  We do not have a cash register.  We do not go

15  to a bank and bring in money.  We wire transfer -- wire

16  transfers in, wire transfers out, personal checks out,

17  personal corporate checks, not bearer items, not certified

18  checks, not cashier's checks, not bank guaranteed funds,

19  not Western Union funds, not postal money orders --

20  corporate checks.  A non-Treasury reporting item.

21         "Or money transmittal or remittance services."

22  We sell e-contracts.  That's all we sell.  And we buy

23  e-contracts.  We have a bid and ask price.

24         "Or issues or redeems money orders."  We don't.

25  We don't accept money orders.  Or travel checks.  We don't

1    do that.

2            "Or other similar instruments or of any other

3    person who engages in the business in the transmission of

4    funds."  We don't engage in the transmission of funds.

5    We sell contracts of e-gold liability.  What makes those

6    contracts worth what our customers believe they're worth is

7    that they are backed by bullion 100 percent of the time.

8            "Including any person who  engages as a business

9    in an informal money transfer system."  Our business is to

10   sell e-gold contracts, just like the court in 47/10 found.

11   We are in the business of selling contracts.  We do not

12   exchange currency, we do not accept currency, we do not

13   issue currency, we do nothing outside of the banking

14   system.

15           Now, I will tell you, as an aside, that I have

16   worked mightily since I was first engaged, almost nine

17   months ago, to sit down with Secret Service myself.  When

18   I convinced -- I convinced -- the Internal Revenue Service.

19   Now, Judge, I'm going to point that out.  I convinced.

20   I came into a case in which there was an Internal Revenue

21   Service examination and an international examination, and

22   I said, "You guys, you're off the reservation.  You're not

23   supposed to be doing this work.  You should be doing a BSA

24   examination."  And I sat down with the Internal Audit

25   Service in Melbourne, Florida, which has a BSA Group, and

1    said, "Please start the BSA examination.  Because this is

2    BSA activity.  This is not income tax and it's not

3    international tax, it's BSA."

4           And they said, "You know?  You're right."  And

5    they brought in the regional director from Tampa and their

6    national expert from Colorado, and we sat down and we've

7    had two 10-hour meetings already, in which they said,

8    "You're the paradigm of a non-regulated money service

9    business, because we don't see how you're regulated, but

10   we'd like to find a way to deal with you in a more rational

11   sense because you don't fit into these criteria."

12          THE MAGISTRATE JUDGE:  Before you go on, counsel,

13   I noticed several indications of the United States

14   Commodities Future Trading Commission.  Do they or have

15   they ever asserted regulatory authority over this business?

16          MR. FUERST:  I'm sorry?

17          THE MAGISTRATE JUDGE:  Have they ever asserted

18   regulatory authority over this business?

19          MR. FUERST:  The Commodity Futures Trading

20   Commission is currently investigating whether they have

21   regulatory authority over this business.  Here's the issue,

22   because that's a case that I've been working, as well.

23          CFTC's attorneys say that their problem is we

24   don't have a futures contract.  There is no future delivery

25   of gold.  The bullion exists; it's there today.  I'm not

1    sure -- is the Court aware of how Good London Gold Exchange

2    works?

3            THE MAGISTRATE JUDGE:  The Court is on a judicial

4    salary.  That's probably the last thing the Court knows.

5            MR. FUERST:  Okay.  Well, let me --

6            THE MAGISTRATE JUDGE:  Certificates of deposit

7    are about it, counsel.

8            MR. FUERST:  Let me explain it this way.  In

9    order for Good London Gold Delivery Gold to exist, that

10   gold has to be minted.  And one of the sources where it is

11   minted would be Nova Scotia Bank.  They own a minting

12   operation.  That gold is determined to be 999.99 proof, and

13   it immediately goes into a gold vault.  There are vaults

14   around the world -- Fort Knox is one of them, but that's a

15   government vault.  There's vaults in Zurich, Dubai, in the

16   U.K., and the gold goes there.  And it sits in the vault.

17           If Morgan-Stanley buys $10 million worth of gold,

18   it will be taken off a tray that sits in the middle of the

19   vault and put into sort of like a wine closet you might see

20   at Smith & Wolensky's, with the name of whoever the

21   basketball player is who claims to own that box or the

22   lawyer who owns it, and that's their gold.  And as long as

23   they have credits for or own enough gold to make up a bar,

24   the bar goes in there.  Maybe they have ten bars, maybe

25   they have 20 bars.  Maybe they buy enough, but it's not a

1  whole bar.  Well, then some gnome writes down on a

2  certificate, a digital certificate, that X additional

3  ounces of gold belong, and through trading in and out, when

4  another bar is achieved or a bar equal to a bar is lost, a

5  bar will come out, a bar will go in.

6          You can't remove Good London Gold from the vault.

7  It just travels around a closed circuit, very much like our

8  e-gold circuit.  The moment that gold comes out, it's no

9  longer Good London Gold.  You can't walk up there and say,

10  "Give it to me."  Because the moment you walk out with it,

11  it now becomes something else.  It has to be re-purified.

12  It has to be re-minted and re-assayed to be a hundred

13  percent, or 999.99 gold bullion.

14          So, while our customers have the right to redeem,

15  the practicality is that a bar of 999.99 gold is worth, at

16  any one point in time, between 400 and maybe 500 thousand

17  dollars.  If they went there and they said, "Okay, I got

18  e-gold, $500,000.00, give me a bar," they could get the

19  bar, but the moment they walked out the door with it it's

20  no longer worth what they paid for it.  Why?  Because now,

21  in order for them to use it, it'd have to be re-assayed.

22  It'd have to be melted down, determined to be pure, so

23  nobody would ever do that.  It's not logical to do that.

24          So therefore, the CFTC says, "Hmm, they have the

25  legal right to it, but they don't have the practical right

1    to it, but it's not a futures contract, it's an actual

2    delivery item," and I have been in negotiations with the

3    CFTC where they have expressed quandary as to how they're

4    going to regulate it.

5           Now, I would suggest to the Court one thing that

6    is true in this case and will be true throughout this case,

7    there is a quandary of regulation here.  The problem that

8    we have, and the reason why we're in front of you today, is

9    that the fact that the Treasury Department, the fact that

10   FINSIN, with whom I have worked on with this, who BSA is

11   part of, the fact that there's no clear regulatory regime

12   doesn't bring you to regulation by seizure a criminal

13   prosecution.  The paradigm doesn't work that way.  The

14   paradigm is, make clear law and fit in.  My client

15   desperately wants to fit in.  They're not the charlatans in

16   this business.  They are a very serious business, trying to

17   run a serious operation which, to some extent, has some

18   political overtone to it, but so what?  This is America; we

19   can have those political overtones.

20          If you want to regulate the business, let's

21   regulate it.  As I've discussed with the BSA Group, "Tell

22   me what regulation you want."

23          I'll tell you what, Judge.  You want me to be

24   regulated like a bank?  Get me access to the Fed Wire

25   information.  You want me to do the due diligence on where

1   my money is coming from?  Allow me to see the due

2   diligence.  But you see, because I'm not a bank, I don't

3   get to see the trail behind the front end of the wire

4   transfer.  I can see that the wire transfer went from

5   Citibank to SunTrust, but I don't get to see where it went

6   to get into Citibank.  If I was a bank, I'd be entitled to

7   see that.  But as a non-bank, I can't see that.  But yet

8   they're going to say that we are involved indirectly in

9   money laundering.  Well, let's think about that.

10          If I'm involved in money laundering, now, I got

11  to know.  I've got some ability to stop it.  We do a due

12  diligence, we do as much due diligence as the law allows us

13  to do, because we can ask our clients everything we want to

14  ask, but due diligence does not mean asking somebody a

15  question and getting an answer and accepting at face value.

16          Due diligence means getting an answer and testing

17  it against statistical information that determines whether

18  it's valid or not.  We can't do that with their banking

19  authorities.  We can do it with SunTrust.  We can do it

20  with Regions Bank.  That's how we did it.  And now that we

21  don't have U.S. bank accounts, the only way for us to do it

22  is to use foreign bank accounts, which can only transact

23  business with a U.S. bank if they meet certain

24  requirements, but they can't transact business with U.S.

25  banks any more.  Why?  Because our U.S. bank accounts have

1   been frozen by the government.

2           So our ability to eradicate or do our due

3   diligence has been hampered.  It has been destroyed by the

4   fact that our bank accounts are closed.  We can't run.

5           Now they ask the question, "Why does this kill

6   our business?"  I want to point out to you in making that

7   statement, because I'm not sure that the Government really

8   understands what they're saying, because on paragraph 2 of

9   their memorandum of yesterday, they say that "the seizure

10  only relates to the currency exchange services offered by

11  OmniPay, a relatively small part of Gold & Silver

12  Reserve's --

13          THE MAGISTRATE JUDGE:  Thank you.

14          MR. FUERST:  -- "overall business."

15          THE MAGISTRATE JUDGE:  Yes.

16          MR. FUERST:  Okay?  But on page 6 they say,

17  page 6 and under the last paragraph, beginning, "Pursuant

18  to Title 18, U.S. Code," "the Gold & Silver Reserve,

19  dba OmniPay, is a money transmitting business because it is

20  engaged, as its sole business activity, in the transmission

21  of funds for the public."  So it's a relatively small part

22  on page 1, it's our sole activity on page 6, and then on

23  page 7, it is, at the paragraph near the bottom that

24  begins, "Clearly, the Regions and SunTrust accounts provide

25  the means by which OmniPay is able to provide an unlicensed

1  money transmitting business in that OmniPay's entire

2  business is dedicating to provide --."  "Entire business."

3  So it's a small part, it's the sole business, it's now

4  entire business.

5       What is the truth?  The truth is that without

6  that portal, one, we can't do a due diligence.  Without

7  those bank accounts we can't do it.  We rely upon banking

8  due diligence to do what we are not legally able to do.

9  Not that we don't want to do, but that we're not legally

10 able to do.

11      And two, we need it to fulfill InExchange and

12 OutExchange requests of our customers.  So we can buy and

13 sell their contracts.

14      Three, we might be able to work an arbitrage,

15 matching buys and sells, but the problem is we can't manage

16 instantaneous exchange without having a capital account.

17 Because there will be an imbalance, there'll be more people

18 wanting to take money out of e-gold -- or, take value out

19 of e-gold, I'm sorry -- or put value into e-gold in an

20 imbalance, and without the cushion of Gold & Silver Reserve

21 to do that, they can't manage that transaction.

22      Also, since we are foreclosed from operating, one

23 of the nasty remarks of counsel when I was speaking with

24 her, she says, "Well, open another account."  How do I open

25 another account?  In this day and age, where the Secret

1    Service executed a seizure of an account, what other banks

2    are going to open an account for us?  How am I going to do

3    this transaction?

4            So I've got 2.3 metric tons of gold sitting in

5    e-gold.  I've got 23,000 active accounts.  And it's all

6    bottled up because of what?  Well --

7            THE MAGISTRATE JUDGE:  Walk me through a

8    particular transaction.  Like me, Mr. Jones got his Master

9    Charge bill yesterday for all the good times over he had

10   over the holidays.  And after he had a tall glass of water,

11   and now from that point on, compare to me what happened to

12   him this Christmas as compared to last Christmas if he was

13   an e-gold customer in both times.  What's the difference?

14   What happened last year, what happened this year?  What

15   happened to him today when he wrote that check?

16           MR. FUERST:  Well, he needs to pay his Master

17   Card bill.  He would call OmniPay and say, "Please write a

18   check," it's like automatic bill-pay that you might have,

19   "Please write a check."

20           Well, Gold & Silver Reserve, OmniPay, would, on

21   a bid and ask basis, buy e-gold liabilities that are in a

22   customer's e-gold account.  Now, if the check was -- well,

23   if he needed $500.00 to pay the bill, they would buy

24   $500.00 of e-gold liability.

25           By the way, if he happened to have -- if his

1   cousin Andre was in France, cousin Andre could do the same

2   thing.  Call and say, "And I want euros."  In which case,

3   Gold & Silver would buy those liability contracts and then

4   would send payment through the Fed Wire.  Here or in France

5   or in Australia or in New Zealand, through the Fed Wire

6   system, would send the funds to pay that bill.

7           THE MAGISTRATE JUDGE:  That goes to Citibank.

8           MR. FUERST:  Goes to Citibank.

9           THE MAGISTRATE JUDGE:  Now, by virtue of what

10  happened --

11          MR. FUERST:  Well, it goes to -- is Citibank the

12  credit card issuer in your hypo?

13          THE MAGISTRATE JUDGE:  Let's say it is, yes.

14          MR. FUERST:  Okay, it goes to Citibank.

15          THE MAGISTRATE JUDGE:  Now, by virtue of what

16  happened with this order, what happens now?  Now, is the

17  bill not going to be paid?  Simply --

18          MR. FUERST:  Right.  We're not paying it.

19          THE MAGISTRATE JUDGE:  Can't pay it.

20          MR. FUERST:   We don't have an account to pay it

21  with.

22          THE MAGISTRATE JUDGE:  I understand.  So then he

23  will be told that.

24          MR. FUERST:  Yes.

25          THE MAGISTRATE JUDGE:  And he'll have to figure

1   out some way to do it.

2           MR. FUERST:  Right.

3           THE MAGISTRATE JUDGE:  Until this resolves

4   itself.  Okay.

5           Well, then, you heard me say that the

6   representation was made to me in that phone call by

7   Mr. Cowan that there would be no drawing down of the

8   accounts and I needn't be concerned about that.  Was that

9   true or not true?

10          MR. FUERST:  That there would be no draw-down of

11  the accounts?

12          THE MAGISTRATE JUDGE:  As I told you, one of my

13  initial concerns was there were all these people out there

14  who have these accounts, what would happen to them.  And as

15  I told you, I was reassured by the Government that I need

16  not be concerned on that basis.  And Mr. Cowan had a

17  different understanding than the one you just articulated

18  in terms of how this works.

19          MR. FUERST:  Well, whatever Mr. Cowan's

20  understanding was, all of these funds, the e-gold funds,

21  are effectively frozen.  Because, except for the portal,

22  except for the process, we can't conduct the transactions.

23          Now, there are other accounts.  But I can assure

24  you that your neighbor in Gaithersburg, when his bank

25  account receives a wire transfer from a bank in Estonia,

1  they may very well, appropriately under BSA regulations,

2  say, "Wait a minute.  Why are you receiving a transaction

3  from Estonia?  What do you have?"  Because under the Bank

4  Secrecy, that would be what's considered an "exceptional"

5  transaction.  And would generate an inquiry.  Because he's

6  never transacted a business with Estonia.

7       Anybody who's ever maintained a law practice can

8  tell you that I get wire transfers from clients, I notify

9  my bank in advance.  "Hey, I'm getting a wire transfer and

10  it's this amount for a real estate closing," or for a

11  business transaction.  Why?  Because it's an extraordinary

12  amount of funds, it's out of routine, and therefore it has

13  to go through the filter.

14       So right now no American, no U.K. person, no

15  Canadian person, no Australian person, where the BSA

16  legislation is of a quality that it is here, would accept

17  funds from an Estonian bank or a Latvian bank readily

18  without having an explanation why.  It is a problem.

19       It is a problem that we are working with every

20  day, but basically the e-gold accounts of people who would

21  use Gold & Silver Reserve OmniPay as the payment portal to

22  buy and sell their e-gold contracts, and god forbid,

23  because the value of gold went up so high this year,

24  they're in the process of losing the effect of that value

25  as we turn the new year and the business cycle turns over

1  again, could there be a loss of 10 percent of the value of

2  their accounts if nothing happened?  Yes.

3       The reality is, as long as we are effectively

4  shut down those people who have access to e-gold accounts

5  who can continue to operate their businesses within the

6  e-gold service are in a buying position.  They're now in a

7  good position.  And those who want to have access to their

8  e-gold value in a currency form, such as dollars or euros

9  or yen, are in a weakened position.  So it's creating an

10 imbalance in the market that exists between the two

11 processes.

12      But I would also draw the Court, since we got

13 this this morning and I was reading it on the way over

14 here, it seems to me that the crux -- I was trying to find

15 the criminal act here in the affidavit, and I think I found

16 it on page 10, paragraph 21.

17      THE MAGISTRATE JUDGE:  Yes, that's the one.

18 That's the one where the representation was made by the

19 agent as to the significance of this --

20      MR. FUERST:  Yes.

21      THE MAGISTRATE JUDGE:   -- and that was the

22 crucial -- what I considered, when I read this, the

23 absolutely crucial paragraph.

24      MR. FUERST:  After comparing the complexity of

25 transactions and fees incurred to either fund or spend

1    e-gold, bearing in mind that he really doesn't understand

2    the fees and structure but let's just deal with this; let's

3    accept his statement as to the fees and structures, but I

4    can tell you that 23,000 customers and 2.3 metric tons of

5    gold would explain why these transactions exist for

6    legitimate people and have for ten years.

7           "After comparing the complexity of transactions

8    and fees incurred to either fund or spend e-gold versus

9    simply wiring funds through traditional banking

10   institutions, there appears to be no economically sound

11   reason for using e-gold to make funds transfers or payments

12   other than to avoid reporting requirements."

13          Well, let me ask you, Judge.  What reporting

14   requirement are we avoiding?

15          THE MAGISTRATE JUDGE:  Well.

16          MR. FUERST:  Every single currency, national

17   currency, sovereign currency, that is somehow entered into

18   the e-gold circle has to enter through the Fed Wire in

19   dollars.  It comes in through Regions Bank or SunTrust.

20   What reporting requirement are we missing?

21          And, since every digit, every X or O in the

22   digital ether out there, is permanently recorded and

23   available to the government, and the government has relied

24   upon us 300 times in the last two years for that data, and

25   never once saying, "It's not adequate, it's not fast

1   enough, it's not legitimate, it's a problem, you are

2   facilitating this," no.  They've said, "Gee, we need this

3   information right away, how fast can you get it to us," and

4   we've turned it over to them.

5            THE MAGISTRATE JUDGE:  Okay.

6            MR. FUERST:  Including -- and this is the last

7   point -- including, last summer, when I received a

8   telephone call from an FBI agent who told me, over the

9   telephone, that there was a terrorist in Russia who had

10  exploded a bomb in a bank in Russia, was planning on

11  exploding four more and asked to have e-gold transferred

12  to his e-gold account, and could we supply him with the

13  information?

14           And I said, "Well, you're supposed to serve us

15  with a subpoena, but under the Patriot Act there's an

16  exception.  If you send me a letter saying, 'Life and limb

17  is at risk,' we will give you a databank of this

18  information; just give me the Web address where you want

19  it; you will have it within the hour."

20           He said, "Well, the FBI's computers are not

21  secure.  Can you print it out and fax it to me?  Because we

22  really need it real fast."

23           And we faxed it to him.

24           And an hour later, "Thank you very much, we

25  appreciate the information, we forwarded it on to the

1    Russian government, they are doing what they need."

2            Nobody ever said, "Oh, wait, wait a second, what

3    business are you in?  You shouldn't be in that -- you can't

4    be in that business.  Because you are involved --."

5            No.  What they wanted to know was how did the

6    money get in, how did it become e-gold, who had the ISP,

7    who had the address, how did this circulate, where was it

8    being transferred to, where did that person who would get

9    the e-gold do an OutExchange to remove the value from the

10   system, what bank, what address, where is the house, what

11   car does he drive, what Social -- what license plate does

12   it have on it, and where does he work.

13           And you know something?  The link for all of that

14   information is us.  Why?  Because we have the information.

15   Because we don't intend to facilitate money laundering,

16   terrorism, or criminal activity.

17           What we do intend to do is fulfill our duties

18   under the BSA and the Patriot Act as well as we can within

19   the limits of what the law says we're allowed to know.

20           THE MAGISTRATE JUDGE:  Okay.  Let me hear from

21   the Government.  Thank you very much, counsel.

22           MR. FUERST:  Thank you for the time, Judge.

23           THE MAGISTRATE JUDGE:  You'll have more time at

24   the end.

25           MS. RIMON:  Good morning, Your Honor.

1          THE MAGISTRATE JUDGE:  Good morning.

2          MS. RIMON:  Mr. Fuerst has raised many, many

3    issues and talked a lot about e-gold and some of the

4    broader issues involved in this investigation.  The larger

5    investigation, as I believe Your Honor knows, does involve

6    potential money laundering and all of the wider aspects of

7    e-gold, Limited.  That company.  The investigation is

8    ongoing and those are things that we really don't feel is

9    appropriate to get into at this time.  There are aspects

10   related to credit card fraud, child pornography, and that

11   sort of thing that they're not directly relevant to the

12   issue that's before the Court right now today.

13          THE MAGISTRATE JUDGE:  What do you see the issue

14   of the Court being?

15          MS. RIMON:  The issue is whether these two

16   accounts, which are OmniPay accounts -- and that is, Gold &

17   Silver Reserve doing business as OmniPay, not e-gold

18   accounts, which is a separate corporate entity owned and

19   operated by the same people but with separate and

20   completely distinct functions, are involved in a violation

21   of 18 U.S.C., 1960.  And if so, they are subject to

22   forfeiture under Section 981 of Title 18.

23          THE MAGISTRATE JUDGE:  Well, let's take a look at

24   that.  Look at 981.  It says, quotes, "The following

25   property is subject to forfeiture of the United States,"

1    and it specifies "property involved in a transaction in

2    violation of 1960."

3        But note the words.  981 talks of "civil

4    forfeiture," and that takes us to 983(j), which talks about

5    the circumstances under which the government may secure a

6    restraining order or injunction.  It then follows, does it

7    not, that the only means for the relief you sought from me

8    is by invoking 983(j).  We are dealing with a civil

9    forfeiture.  And the rules pertaining to civil forfeiture,

10   according to Congress, are in Subsection (j).  Aren't they?

11       MS. RIMON:  I don't believe that's entirely

12   correct, Your Honor.  983 deals primarily with a situation

13   where you have an administrative forfeiture and then a

14   judicial civil forfeiture already in place.

15       THE MAGISTRATE JUDGE:  No, it doesn't say that.

16   Because Subsection (b) gives us two possibilities.  One,

17   "upon the filing of a civil forfeiture complaint alleging

18   that the property with respects to which the order is

19   sought is subject to civil forfeiture --" that hasn't

20   occurred here, because you never filed your complaint.  Or,

21   (b), "prior to filing such a complaint if after notice to

22   persons appearing to have an interest in the property and

23   so forth," and then there are findings that must be made.

24       What I don't understand, counsel, is why you

25   believe 981, which speaks of civil forfeiture, permitted

1  you to use a warrant which was issued by me pursuant to my

2  authority in criminal matters.  It's an extraordinarily

3  important point.  I am a magistrate judge.  Had you filed

4  your civil action or made your application under 983, you

5  would have to go to a District Court judge.  I don't have

6  any jurisdiction over the subject matter.

7          How can it possibly be that if Congress has

8  specified in 983 what you must do, you could circumvent

9  that procedure by using the warrant procedure under Rule 41

10 if, as I understand what you tried to do.

11         MS. RIMON:  It's not circumventing, Your Honor,

12 and Your Honor does have authority under 981(b)(2), which

13 provides for seizures, and that is pursuant to Rule 41, and

14 that gives Your Honor the --

15         THE MAGISTRATE JUDGE:  Wait a minute, you've lost

16 me.

17         MS. RIMON:  I'm sorry.

18         THE MAGISTRATE JUDGE:  Where is that in 983?

19         MS. RIMON:  981(b)(2), "Seizures pursuant to this

20 section shall be made pursuant to a warrant obtained in the

21 same manner as provided for under the Federal Rules of

22 Criminal Procedure."

23         THE MAGISTRATE JUDGE:  I'm sorry, I've lost --

24 where are you reading?

25         MS. RIMON:  981, I believe I've got it right, (b)

 1  -- Subsection (b)(2).

 2          THE MAGISTRATE JUDGE:  674.  And that takes us to

 3  Subsection (b), "There is probable cause to believe that

 4  the property is subject to forfeiture and the seizure is

 5  made pursuant to a lawful arrest or search."  What lawful

 6  arrest or search was made here?

 7          MS. RIMON:  I believe that provision that Your

 8  Honor just read relates to where it says above, "except

 9  that a seizure may be made without a warrant if," and then

10  there's (a) or (b).

11          What I was referring to was Subsection (b)(2).

12          THE MAGISTRATE JUDGE:  (a) is obviously not

13  applicable here.  You never filed a complaint of

14  forfeiture.

15          MS. RIMON:  Not yet.

16          THE MAGISTRATE JUDGE:  Now, (2)(b) says that

17  "seizures pursuant to this section," which is 991, "shall

18  be made pursuant to a warrant in the same manner as

19  provided for a search warrant."  Under a search warrant you

20  would have to show probable cause to believe that the money

21  in these accounts offended the law.

22          MS. RIMON:  Exactly.  And I believe --

23          THE MAGISTRATE JUDGE:  Not exactly.  You never

24  asserted that authority in your application.  All your

25  agent ever said was there was probable cause to believe

1   they were operating a money transmitting business.  That

2   doesn't mean that the money in that account is the

3   instrumentality or proceeds of a crime.

4        What crime is being done here?  What crime did

5   they commit?

6        MS. RIMON:  Your Honor, respectfully, the crime

7   is a violation of 1960, and we did cite this --

8        THE MAGISTRATE JUDGE:  Oh, I see.  So it is your

9   position that by virtue of their not being licensed, any

10  account which has the funds is subject to forfeiture

11  pursuant to Rule 41, and not pursuant to the procedures

12  pertaining to a civil forfeiture of 983.

13       MS. RIMON:  They are not mutually exclusive.

14  But here, yes, under 18 U.S.C., 981, specifically, "any

15  property involved in --" and in this case, these two

16  accounts are the mechanism by which the 1960 violation is

17  occurring -- "any property involved in a violation of 1960

18  is subject to forfeiture."

19       Also under 981, seizure is available following

20  the procedures in Rule 41, and we did put those statutes --

21       THE MAGISTRATE JUDGE:  But look at 1893(j)(3).

22  Note the limitations it places on the ability to get the

23  TRO in the first place.  And note that the order is not

24  good for more than 10 days.  Here, by virtue of using the

25  authority under the Criminal Rules of Federal Procedure --

1    Criminal Procedure, you have caused a forfeiture which is

2    infinite and indefinite.  Can you evade 983 in that way?

3    Do you think Congress intended to permit you to do that?

4            MS. RIMON:  We can't and we haven't and we won't.

5    We are required to file a complaint within a period of time

6    that complies with due process.

7            THE MAGISTRATE JUDGE:  When is that?

8            MS. RIMON:  The case law does not specify, and

9    I'd like to just make sure the Court understands --

10           THE MAGISTRATE JUDGE:  So let me see if I

11   understand something.  You're saying that if -- property is

12   subject to a civil forfeiture under 981.  The United States

13   has two arrows in the quiver.  If the money, if the

14   proceeds, if the object to be seized, the res to be seized,

15   is instrumentality of a crime or proceeds of a crime, it is

16   subject to seizure under Rule 41.

17           MS. RIMON:  That's correct.

18           THE MAGISTRATE JUDGE:  If it is subject to

19   seizure under Rule 41, you are not required to comply with

20   983 simultaneously.  In other words, as I understand it,

21   what you are doing is complying with these in two phases.

22   Phase 1 is the criminal seizure pursuant to the warrant.

23   Phase 2 will occur when you come in and seek relief under

24   983(j) by filing your civil complaint for forfeiture and

25   seeking a TRO?

1          MS. RIMON:  The seizure that we sought from the

2     Court was a civil seizure based on civil statutes, and

3     that's what we recited in our application.

4          THE MAGISTRATE JUDGE:  You cited one statute.

5     You cited 981.

6          MS. RIMON:  981 --

7          THE MAGISTRATE JUDGE:  I reviewed it this

8     morning.

9          MS. RIMON:  And that's --

10          THE MAGISTRATE JUDGE:  There was no reference to

11     the Criminal Rules of Criminal Procedure under Rule 41.  If

12     you look at the application, the agent asserts that the

13     violation is 981-based, as I recollect.

14          MS. RIMON:  I believe we referred to 981(b)(2),

15     which is the statute that provides for seizures, and itself

16     refers to the Criminal Rules of Procedure.

17          THE MAGISTRATE JUDGE:  I'm not quibbling over

18     that.  But what I'm trying to figure out is, is it your

19     position that Congress intended in this situation that in

20     effect you get two things.  You get an immediate seizure

21     without notice or an opportunity to be heard, and then a

22     TRO if you can make the showing.

23          I take it that it is your position that if you

24     don't make the showing under 983, the warrant expires and

25     with it the power to hold the money?

1          MS. RIMON:  The warrant was for seizure, and the

2    provision that Your Honor just referred to, 983(j), refers

3    to restraining orders.  So --

4          THE MAGISTRATE JUDGE:  Yes.

5          MS. RIMON:  So what we're talking about is a

6    seizure --

7          THE MAGISTRATE JUDGE:  A restraining order would

8    take the form of telling them not to operate until they got

9    the license.

10          MS. RIMON:  It could.

11          THE MAGISTRATE JUDGE:  And in the meanwhile it

12    appears to me the Court has power, for example, to appoint

13    a receiver or to hold the money in escrow until that is

14    done.

15          MS. RIMON:  That is correct, Your Honor, and

16    those are things that we could ask for under 983.  We

17    haven't.  What we asked for was a seizure warrant of any

18    funds in the account at the time and any funds that would

19    come into the account, under 981.  So they're not exactly

20    analogous.  They do operate at the same time.

21          For the Court's background, Section 983 is a

22    recent addition -- well, in 2000, and it was added

23    particularly for the situation where you have an

24    administrative forfeiture.  It set certain time limits for

25    when a complaint must be filed and when a person files a

1   claim in an administrative proceeding, and a lot of that,

2   so there is some overlap.

3           There's also the ability to file a complaint and

4   get a warrant for arrest in rem of certain property which

5   doesn't even require a judge's determination of probable

6   cause at all, but is in effect a seizure warrant.  It

7   instructs the holding institution to arrest that property

8   and turn it over to the government, so that's a even more

9   drastic option which is available, which we haven't made

10  use of here.  So there are actually two or three different

11  options and possibilities.  The statutes are not entirely

12  exclusive.

13          So, yes, but I think the key point is that what

14  we asked for was a seizure warrant.  We didn't ask for a

15  restraining order under 983(j).  We may in the future; that

16  may be something that we do.  We are intending to file a

17  complaint, as I indicated to Mr. Fuerst.  And that will

18  start the ball rolling with regard to a civil forfeiture

19  action.  That was the basis of our request.

20          THE MAGISTRATE JUDGE:  But in the meanwhile you

21  hold the money.  And you hold the money without making the

22  showings you would have to make under 983(j), which

23  requires you to show, for example, that you will prevail on

24  the issue of forfeiture and that the failure to enter the

25  order will result in the property being destroyed, removed

1    from the jurisdiction of the Court, or otherwise made

2    unavailable for forfeiture.

3         So what you're saying is, you have the option

4    here.  If you proceed under 983(j) and warrant at that

5    point, for example, to create a receivership, to appoint a

6    conservator or custodian or whatever, or to seize or secure

7    the property, you would make the showings under 983(j).

8    You would then go before a District Court judge and he

9    would determine, or she would determine, whether you've

10   made the showings.  And then and only then would the

11   seizure issue.

12        But what you're saying is, by virtue of the

13   authority granted under 981(b)(2), you can circumvent that

14   process by showing probable cause to believe that the

15   assets in these accounts were the proceeds of a crime, and

16   that crime is not having a license to engage in a business.

17   That's your position.

18        MS. RIMON:  Except for the Court's

19   characterization of a circumvention, and I would like to

20   also point out that what we could have done was filed a

21   civil complaint, had the Clerk issue an arrest warrant

22   in rem, taken those to the banks, and without any judicial

23   determination of probable cause whatsoever, have seized

24   these accounts, which would have been, in our view, not as

25   fair a proceeding as coming before Your Honor and asking

1  for a probable cause determination.  So there's yet even

2  another possibility that we could have done but we didn't,

3  because we felt that this was more appropriate.

4       We are not entitled to sit here and hold on to

5  these funds indefinitely and not allow for any process

6  whatsoever for the owners of the property to come in and

7  make their allegations, their arguments that they're

8  entitled to release of the funds, and that's not what we're

9  doing.  And we're here this morning and these issues are

10 being heard.  And they'll be heard more fully once we file

11 a complaint.

12      THE MAGISTRATE JUDGE:  When you are going to file

13 your complaint?

14      MS. RIMON:  We expected filing it within 30 days,

15 and I think that that's on target.

16      THE MAGISTRATE JUDGE:  What will happen to the

17 accounts of these people in those 30 days?  You've heard

18 counsel explain to me -- first of all, as we began,

19 Mr. Cowan, when I expressed that very concern, told me I

20 need not be concerned on that basis.  But now counsel has

21 just explained to us that checks are bouncing all over the

22 world, thanks to the seizure.

23      MS. RIMON:  Your Honor, if I may --

24      THE MAGISTRATE JUDGE:  What about those people?

25      MS. RIMON:  I would like to explain that, because

1    I believe that Mr. Fuerst has made some misleading and

2    inaccurate statements, and I think it's very important that

3    we understand here the difference between e-gold and

4    OmniPay.  And when I say OmniPay, Gold & Silver Reserve is

5    a dba OmniPay.  That's the title of that business.  And

6    what counsel has done has lumped e-gold and OmniPay in

7    together.

8         E-gold is actually a much larger aspect of the

9    business operated by Mr. Jackson and Mr. Downey, and

10   involves many more customers and a larger value of funds

11   than OmniPay does.  But what we're talking about here today

12   are two accounts that are used solely by OmniPay.  So I'd

13   like to address Your Honor's concerns.

14        And that is that OmniPay provides, at least

15   according to its own description on its Web Site which we

16   included as Attachment D to our response, it offers a

17   currency exchange service.  That's what their own words

18   say.  And that service is to purchase or invest in e-gold.

19        OmniPay is one of very many other companies and

20   individuals that provide an exchange service for the

21   purposes of accessing e-gold.  You don't need OmniPay to

22   make use or to buy or to do transactions in e-gold.  In

23   fact, the vast majority of e-gold transactions are done

24   using other exchangers.  OmniPay has a relatively small

25   portion of the business.

1          So it's not correct to say that what happens here

2     with these two accounts that are used solely for OmniPay

3     affect the entire world of e-gold transactions.  That's

4     simply not true.

5          THE MAGISTRATE JUDGE:  But those checks are

6     bouncing, right?  What about the example --

7          MS. RIMON:  No --

8          THE MAGISTRATE JUDGE:  -- I used of the man who

9     writes the credit card bill today?

10         MS. RIMON:  Right.

11         THE MAGISTRATE JUDGE:  What assurance will you

12    give anyone who asks that that check, that instrument, will

13    be honored?

14         MS. RIMON:  There are two points to that, Your

15    Honor.  First, checks are not bouncing all over.  Account

16    holders or clients or customers of OmniPay are not given

17    checkbooks that they can write checks on.  What they are

18    given is the opportunity to purchase a service from OmniPay

19    which orders a check.  They can place an order through the

20    OmniPay Web site, asking OmniPay to convert X dollars of

21    their e-gold into a check that OmniPay issues in its own

22    name to whatever third-party vendor they want to pay.  So

23    no one is out there having the ability to write checks that

24    are now going to not be funded.

25              In the example that Your Honor gave with the

1    credit card payment.  All that happens is that person who

2    has a credit card bill that they want to pay with their

3    e-gold, they cannot pay it with OmniPay through these two

4    accounts.  They can make use of the many other exchangers

5    out there that offer payment through debit cards, cash

6    value cards, other bill payment services.  That e-gold is

7    accessible to them.  But not through OmniPay.  Through

8    these two -- as long as these are the only two accounts

9    that OmniPay has operating, they can't use OmniPay.

10           And we also submitted -- just so the Court is

11   aware, the type of customers that OmniPay has, it's not --

12   looking at it overall, it's generally not your individual.

13   It's not your private investor.  The vast majority of

14   transactions -- we submitted a spreadsheet in Attachment C

15   -- involve other exchangers that use OmniPay as their own

16   exchanger for batch exchanges, for clearing their

17   exchanges.  And the transactions, for the most part, are

18   with several other companies, not with individuals.  So

19   those companies will have to go somewhere else or exchange

20   directly with e-gold, but none of what we're talking about,

21   no aspect of the seizure warrant here, has any impacts on

22   e-gold transactions.  You could go to e-gold's Web site

23   today and conduct an e-gold transaction.  You just can't

24   use OmniPay to do it.  And I think that that has not been

25   made clear, and I think that the statements that have been

1    made have been misleading about that.

2            And what the Court is faced with here is whether

3    these two accounts, used solely by OmniPay, are involved in

4    a violation of 1960.  And I would like to go through also

5    the statutes with you to make it clear how we understand

6    and we interpret 1960 to apply here.

7            THE MAGISTRATE JUDGE:  Well, let me sort of

8    explain something that has been so troubling to me about

9    the procedural aspects about this.

10           On the civil side, had you proceeded civilly and

11   made your applications, you know as well as I that if the

12   Court found there were genuine issues in material fact,

13   there would have to be a trial.  Right?  And what we have

14   here are allegations being flung back and forth, without an

15   evidentiary basis on which to rule.

16           Now, by virtue of your going the way you did, you

17   circumvented the Federal Rules of Civil Procedure which

18   would of course place a structure on how these issues were

19   to be litigated.  What do we do about that?

20           MS. RIMON:  But with respect, Your Honor, I

21   believe that's incorrect.  We have not as of this time, nor

22   if we filed a civil complaint, would we have any order or

23   entry of forfeiture.  A civil complaint may be filed

24   similar to the seizure warrant application based on

25   probable cause.  And based on probable cause, the Clerk is

1   required to essentially arrest the defendant property.

2   That property is held pending a full determination of the

3   issues and potentially a trial, but it's still held unless

4   there is some basis for release --

5           THE MAGISTRATE JUDGE:  You missed my point.

6   I don't care about that.

7           What I care about is when genuine issues of

8   material fact arise, as they have now arisen -- look at the

9   fundamental difference between you as to the consequences

10  of the order -- they are resolved, are they not, under the

11  Federal Rules of Civil Procedure either on summary judgment

12  if summary judgment cannot be ordered, if there are genuine

13  issues of material fact.  Once genuine issues of material

14  fact now have arisen, how do you suggest we proceed?

15          MS. RIMON:  Your Honor, I believe the question

16  is, is there probable cause that these two accounts are

17  involved in a violation of 1960.  Not whether there are

18  genuine issues of material fact.  I think --

19          THE MAGISTRATE JUDGE:  But there are material

20  issues of genuine fact as to whether they are in violation

21  of 1960.  That is the fundamental factual and legal issue

22  that divides you.  And it involves the taking -- doesn't it

23  involve the taking of testimony from people so that factual

24  question can be resolved?  It can't be, on the basis of

25  your ipsa dixit that says they violated 1960, when counsel

1  explains that he thinks they are not.  Aren't you at the

2  process now, or isn't simple -- the requirements of the

3  Federal Rules of Civil Procedure, due process for that

4  matter, require that evidence be taken on that issue before

5  the Court can rule?

6        MS. RIMON:  No, Your Honor.  Under the Federal

7  Rules of Civil Procedure, under all the case law that

8  exists, when you're talking about a civil forfeiture or

9  criminal forfeiture, all you're required to find is -- and

10 it can be done on the basis of an affidavit, even where you

11 have other information that may controvert it -- if the

12 Court makes a finding that probable cause has been met,

13 that there is a basis to issue a seizure.  There's not a

14 basis for this seizure to stay in effect indefinitely, and

15 that's why we will be filing a complaint and all these

16 issues can be raised.

17       But it's our very strong conviction that what we

18 have submitted to the Court -- and I would like the

19 opportunity to explain the facts that support our

20 position --

21       THE MAGISTRATE JUDGE:  Sure.  Go ahead.

22       MS. RIMON:  -- that what we've submitted

23 establishes probable cause and that what's been submitted

24 by Gold & Silver Reserve is actually muddying the waters

25 and does nothing to take away from the facts that we've

1   presented and, in fact, I don't think they've said anything

2   that contradicts the core facts that are the basis for our

3   application.

4            THE MAGISTRATE JUDGE:  Go ahead.

5            MS. RIMON:  And if I may.  What they are, again,

6   relate to the two accounts that are the operating accounts

7   of OmniPay.  1960 requires the licensing or prohibits the

8   operation of an unlicensed money transmitting business.

9   Money transmitting is defined in 1960 -- and I know we had

10  a discussion earlier about other statutes, 31 U.S.C., 5330

11  and all that, and I'm happy to go into those.  But I think

12  that the Court only has to go as far as 1960 itself.

13           1960(b)(2) says, "Money transmitting is defined

14  as transferring funds on behalf of the public by any and

15  all means."  That is a very broad definition.  OmniPay's

16  businesses -- or business, as I pointed out from pictures

17  from their Web Site, which we've provided to the Court,

18  says that "OmniPay offers currency exchange services."

19           Their Web site describes how they take wires in,

20  they transfer wires out, they make wire transfers to fund

21  check payments through their bill payment service.  These

22  are all transferring funds on behalf of the public.  Any

23  person who wants to make use of OmniPay can come and order

24  a transfer of their funds for the purchase of e-gold.

25           And we've also submitted analysis of the

1    transactions that are going on in these accounts.  The

2    Regions bank account includes only wire transfers in and

3    out.  OmniPay has no other business than transferring --

4              THE MAGISTRATE JUDGE:  See, counsel, this is why

5    I'm so reluctant to proceed in this fashion.  This is

6    evidence.  This has to be based on the testimony of

7    evidence.  You keep squaring the circle.  You say there's

8    probable cause, but there's probable cause only if your

9    version of the facts is accepted.  What if your version of

10   the facts is controverted?  Mustn't we take evidence then?

11             MS. RIMON:  I think the time has not come for

12   that, Your Honor.

13             THE MAGISTRATE JUDGE:  When will it come?

14             MS. RIMON:  After we file the complaint and they

15   have an opportunity to present their statement of interest,

16   and then the issue will be fully heard in front of a

17   District Court judge, and that's the procedure that's in

18   981 and 983 and the Supplemental Rules of Admiralty that

19   apply to civil forfeitures.

20             So what the Court is entitled to do at this point

21   is based on the submission by the agent, the affidavit,

22   look at it and determine whether probable cause exists on

23   that, and issue the seizure warrant on that basis, and

24   that's what we have done.  So I think that --

25             THE MAGISTRATE JUDGE:  No, I didn't want to

1  interrupt you, but please go on if you want with the rest

2  of your argument.  You were saying that the words "by any

3  and all means," and then please go on from there.  You see

4  a transfer of funds here.

5          MS. RIMON:  That's right.  And it's our position

6  that 1960 itself resolves the question.  That you don't

7  need to go to any further definitions.  And I'm not going

8  to belabor the point, but I will just point the Court to

9  our recitation in our response that we filed yesterday.

10         THE MAGISTRATE JUDGE:  Well, what do you make of

11  counsel's argument that this has hardly been a secret that

12  he has been in open negotiations with the Internal Revenue

13  Service and the Commodity Futures Trading Commissions

14  agencies that might have jurisdiction here.  And that he

15  has discussed with them the Bank Security Act and its

16  application to the business and what the regulation

17  procedure shall be, and that he has been -- the company

18  has been fully compliant with efforts, including by the

19  Department of Treasury and the Department of Justice, to

20  give whatever information they need to do.

21         MS. RIMON:  First I would say it's not completely

22  accurate.  I don't think now is the appropriate time, nor

23  are we prepared to go into the details.

24         THE MAGISTRATE JUDGE:  Okay, but the point I'm

25  trying to make is the representations that were made did

1    not, to me, when I was asked to issue the warrant,

2    certainly did not bring to my attention that there had been

3    these ongoing negotiations.  That's quite surprising.

4           MS. RIMON:  Your Honor, I caution the Court

5    because I don't think that the way it's been portrayed is

6    entirely accurate.  But also --

7           THE MAGISTRATE JUDGE:  Well, give me your version

8    of what occurred.

9           MS. RIMON:  Well, Your Honor, I can't address

10   every single situation.  I do know that there has been

11   contact with the various agencies that he mentioned,

12   Mr. Fuerst.  I also know that in not every case have

13   subpoenas been complied with timely or cooperatively.

14          But more importantly, that is completely

15   irrelevant.  There is no intent requirement in 1960 --

16          THE MAGISTRATE JUDGE:  It's not irrelevant in the

17   sense of the representations that were made to me with the

18   search warrant.  This was part of an investigation into

19   what I was told was related to a child pornography ring,

20   and that this money was being used.  It never occurred to

21   me in my wildest dreams, until counsel explained it to me,

22   that far from operating surreptitiously, there have been

23   negotiations with this company and the Internal Revenue

24   Service as to the precise issue you raise about

25   transmitting money and being subject to that statute, the

1    Bank Secrecy Act.  That's not true.

2              MS. RIMON:  Your Honor, we did not put the

3    allegations of involvement in child pornography in our

4    application, and we didn't do that intentionally.  Because

5    we don't think that that is a basis for our request at this

6    time.

7              THE MAGISTRATE JUDGE:  Yes, but the point I'm

8    trying to make is did it occur to you or whoever drafted

9    the warrant to bring to my attention or to whoever the

10   judge was going to be's attention, there were these ongoing

11   negotiations about the very point at issue?

12             MS. RIMON:  Your Honor, based on the information

13   that we had about what type of ongoing negotiations -- and

14   I don't think "negotiations" is the appropriate word -- no.

15   One, we don't have the complete information that Mr. Fuerst

16   has presented, and in some cases what he has said does not

17   fit with our understanding of what has gone on.

18             THE MAGISTRATE JUDGE:  Okay, well, that's, as you

19   say, not crucial.  But you stopped yourself from completing

20   your argument on the 1960.  If you would like to go on, I'd

21   be glad to hear you.

22             But what you're saying is there is a transfer of

23   funds on behalf of the public by any and all means,

24   because, to go back to the example we have been doing, the

25   transfer between the merchant in Argentina and the merchant

1    in France is a transfer of funds.

2            MS. RIMON:  That's correct.

3            THE MAGISTRATE JUDGE:  What do you make of

4    counsel's arguments that it is no such thing?  That all

5    that is occurring here is that no funds are being

6    transferred, all that is occurring is that people are

7    calling upon reserves they have of gold, on an actual

8    commodity?

9            MS. RIMON:  Again, this is where I think

10   Mr. Fuerst is mixing apples and oranges when he includes a

11   discussion of e-gold with what we're talking about and

12   what's at issue here today, which is OmniPay.  And with

13   OmniPay, the only way that you do transactions is you send

14   wires in or you get wires or checks on your behalf out.

15           So he can talk in great detail, I'm sure, and I

16   know this is going to be an issue that we'll address in

17   great detail on a future date, and that is what e-gold's

18   role in all of this is and whether they're a money

19   transmitter, but today the only issue is whether OmniPay

20   and these two accounts that are used for OmniPay's business

21   purpose are involved in money transmitting.

22           So again, I don't think that really bears on the

23   issue that's before the Court right now.  I think it's

24   obvious and I don't think that anybody would dispute that

25   there are wire transfers going in and out of OmniPay, and

1    in fact that is OmniPay's entire business activity.  They

2    describe themselves as currency exchangers.  It's hard to

3    get more obvious than that.  So based on that, our view is

4    that they certainly fall within the very broad definition

5    of funds transfer.

6              And there's one point I would like to raise,

7    which relates to the issue we talked about just a moment

8    ago, and that is in terms of what the intent is that's

9    required, and I think that goes to the issue of what

10   discussions may or may not have ever been held with various

11   regulatory agencies on whether or not the regulations

12   apply.

13             There is no knowledge requirement.  There was a

14   change to 1960 as part of the Patriot Act.  There is no

15   requirement that OmniPay GSR, doing business as OmniPay,

16   knew they were required to be licensed and decided to flout

17   the regulations and go ahead with their operations anyway.

18   All that's required is that they knew they were a money

19   transmitter, which they clearly did because they advertise

20   that service.  And that they in fact did it and were not

21   licensed, either on the federal level or on the state

22   level.

23             So again, I just urge the Court to keep the focus

24   narrowed to the two accounts that we're dealing with, and

25   not open up other issues that are certainly going to be

1  dealt with on another day.

2          THE MAGISTRATE JUDGE:  Thank you, counsel.  You

3  have anything else?

4          MS. RIMON:  No, Your Honor.

5          THE MAGISTRATE JUDGE:  Counsel?  Would you devote

6  at least a portion of your argument to the procedural

7  problem that I have raised?

8          MR. FUERST:  Yes, Judge, I will.  First, since

9  the procedural aspect goes back to 1960, I'd like to focus

10  the Court on 1960.

11          If the Court has 1960 in front of it?

12          THE MAGISTRATE JUDGE:  It does.

13          MR. FUERST:  1960(a), getting to counsel's

14  comment about the change in the mens rea standard of the

15  statute, the mens rea standard was not removed from

16  1960(a), someone who knowingly conducts, controls an

17  unlicensed money transmitting business.  So the first

18  question is, did they know they were conducting an

19  unlicensed money transmitting business, and therein lies

20  all our communications with the government and what we were

21  trying to establish . But let's turn to the more important

22  parts of what the Government says just now.

23          1960(b).  It defines an unlicensed money

24  transmitting business means a money transmitting business

25  that affects interstate commerce, and then it gives (A)

1   and (B).

2          THE MAGISTRATE JUDGE:  Yes.

3          MR. FUERST:  And you'll notice that (A) and (B)

4   talk about -- (B) brings in 5330, which then brings in

5   5313, and we've done that.  So, but if you'll notice that

6   (A) and (B) talk about money.  They only refer to money.

7   The word "fund" does not appear anywhere in (b)(1)(A) --

8   cap (A) or cap (B).  No word "fund."  Just "money."  So we

9   don't have that to deal with.

10          Counsel would then like to bring in the word

11  "fund," and she does it in her pleadings.  She goes to (C),

12  "otherwise involves transportation of -- or transmissions

13  of funds that are known to the defendant to have been

14  derived from a criminal offense."  And what she defines as

15  a criminal offense is 1960.  It's not drug running.  It is

16  not child pornography.  It's not all the other predicate

17  specified unlawful activities that are contemplated by

18  Congress in this.  This is the proverbial snake swallowing

19  its tail.

20          What brings the word "funds" -- and she only gets

21  to us, she only gets to OmniPay, by the use of the word

22  "funds" here, she only gets there by saying that to comply

23  with money transmitting business regula -- otherwise

24  involves the transportation or transmission of funds.  It's

25  the only place where you don't have money.  Sovereign

1   currency of a sovereign government.  Funds.  The only way

2   you get there under this statute, under 1960, is to say

3   that 1960 violates 1960.

4          Now, as far as the procedural ramification,

5   I think the Court is dead on on what the Court has

6   articulated, because we're either in a civil environment

7   or in a criminal environment.  They get to the criminal

8   environment and they get to Rule 41 and this darkness that

9   descends upon us for 30 to 60 or 90 days, till they get

10  around to the civil complaint, if we have a criminal

11  violation of the law, but what's a criminal violation of

12  the law?

13         Again, it's 1960 which, as I've just described

14  to you, since she doesn't want to go -- the United States

15  doesn't want to go into 530, because going into 530 gets

16  you to 513, we've done that, it doesn't get them there.

17  So they go to 1960, but 1960, the two phrases that deal

18  with money say, "Go to 530," so we're going to invent the

19  word "funds," and "funds," that use of the word funds, gets

20  back to e-gold, because it's some type of value, but then

21  the only violation is 1960 again.  So that's why you're

22  right.  They need to be in 981 or 983.

23         If the problem is that we're supposed to be a

24  registered money transmitting business, if that's the

25  problem and you want to freeze me, then do a 981, 983, and

1    let me go in -- we'll go in for the TRO, we'll have our due

2    process, and we'll win or lose, but at least we'll have an

3    opportunity to engage in due process.

4           Right now what we have is a civil case which is

5    hoisted on the petard of a violation of 1960, which is the

6    snake swallowing its tail, and it reminds me of when you go

7    in to buy a new suit and you're looking in the mirror, and

8    there's a mirror behind you, and you keep looking further

9    and further, but the image gets smaller and smaller, no

10   matter how far you look it's still the same image.  And so

11   I would address the issue that way.

12          Now, regarding her comment, regarding the United

13   States' comment, respectfully, Judge, concerning other

14   exchanges, there are other exchanges.  But the exchange to

15   convert e-gold to cash money, or cash money to e-gold,

16   occurs through OmniPay.  The other exchanges operate, they

17   have a balance of e-gold, they may have a balance of cash.

18   Let's say another exchange, for example, is a UPS Store in

19   Wheaton.  You may go in there and say, "Fund -- or, I want

20   to buy e-gold liabilities.  Here's a thousand dollars of

21   money.  Cash.  Check.  Please sell me e-gold  liabilities."

22   And they will click their e-gold over to an e-gold account

23   that you have.  But when they, in that company, needs to

24   buy e-gold, it gets up, how does it get it?  Where does it

25   get the e-gold from?  It takes its cash money that you

1    gave, it goes to OmniPay and buys e-gold liabilities.

2           So if there's a rush on e-gold and George Bailey

3    is not there to say, "Hey, there's not enough cash in the

4    bank, you got to wait," because that's what's happening

5    right now is we don't have -- and so we're George Bailey

6    and we're holding them back, we can't honor the requests

7    from the UPS Store.

8           Counsel is right.  There are some very large

9    exchange companies that conduct business with e-gold, but

10   all of them -- that's why they're in the list -- all of

11   them have to operate through Gold & Silver Reserve.

12   DBA OmniPay.  All of their customers have to operate --

13   there are exchange customers who do half a million dollars

14   a day in business with OmniPay in order to manage their

15   e-gold account.  They don't have access to those funds

16   either.

17          And yes, we are bouncing checks.  Because we

18   issue checks on our account at Regions Bank.  And those

19   checks have bounced.  They come to us and say, "Where is my

20   exchange?"  If they go to the e-gold account, they will

21   note that the e-gold gold account, the debit has already

22   occurred.  When they transferred, when they sold that

23   e-gold liability contract to Gold & Silver Reserve, click,

24   click.  The liability contract now sits in Gold & Silver

25   Reserve, dba OmniPay, and Gold & Silver Reserve is going

1   to pay for it if they want the OutExchange, by sending the

2   check to UPS of Wheaton, Maryland, for the cash to be

3   delivered.  That's what's happened.  That check has

4   bounced.  And those checks will continue to bounce because

5   there's no way for us to do it.  We don't have a bank

6   account to do it. And worse than that, we cannot do

7   whatever anti-money laundering effort is required without

8   a bank account.

9           So.  I hope I've addressed the procedural

10  question.  If the Court would like to ask me more questions

11  on 981 and 983, I'll be glad to do so.

12          THE MAGISTRATE JUDGE:  No.  Just one question for

13  the Government.  Looking at Rule 41(c), under what rubric

14  of the four items that may be subject to seizure does this

15  money fall?

16          MS. RIMON:  I haven't gone to (c) yet, Your

17  Honor, but I believe that the reference in 981(b)(2) is to

18  the procedures in Rule 41, and the substance of what may be

19  seized is delineated in 981 itself.

20          THE MAGISTRATE JUDGE:  You lost -- oh, I see.

21  So you're saying that (c) is irrelevant if the property is

22  made subject to 981, because 41 talks only of procedures.

23  So that 981 says "property involved in a transaction or

24  transaction in violation of 1960 makes it subject."  So it

25  does not have to be evidence of a crime, contraband fruits,

1    property designed for the use in committing a crime or,

2    obviously, not a person to be arrested.

3            MS. RIMON:  That's correct, Your Honor.  May I

4    correct one other thing?  I'll be brief.

5            THE MAGISTRATE JUDGE:  Well, I'm very concerned

6    about counsel now directly contradicts your contention.  He

7    says checks are bouncing all over the world.  He just said

8    that 30 seconds ago.

9            MS. RIMON:  I'd ask -- the Court may inquire.

10    My understanding is that only OmniPay checks -- OmniPay is

11    the only person -- or, entity, that has the ability to

12    issue a check that could potentially bounce.  They

13    obviously know the accounts are frozen at this point.  The

14    only checks that should have bounced were ones that were in

15    the process at the time of the seizure before they knew and

16    had the opportunity to not write any further checks.  So

17    that period of time should have ended or should end very

18    shortly.  It should not be a situation where anybody could

19    ever write a check now, at this point.  If OmniPay did so,

20    the only point would be to prove that it could bounce.  So

21    that -- the Court, I might ask, could inquire if that's

22    correct.

23            THE MAGISTRATE JUDGE:  I'm about to.

24            MS. RIMON:  Okay.

25            THE MAGISTRATE JUDGE:  Is that correct?  If you

1  want to consult for your clients for a few minutes about

2  that, I'll take a five-minute recess.  It's a crucial

3  point.

4            MR. FUERST:  There are hundreds of checks that

5  have bounced and hundreds that will.

6            THE MAGISTRATE JUDGE:  Thank you.

7            MS. RIMON:  I believe there's no dispute, though,

8  that those are only checks written by OmniPay, and once the

9  ones that are there have cleared that will have come to an

10  end.

11            MR. FUERST:  Well, there is a dispute because of

12  the people who have clicked to have the check issued to

13  their bank to fund the payment of their credit card, that

14  check from their bank has now bounced because the in-bound

15  deposit has not occurred.  That credit card is now overdue.

16  The payment is overdue because the credit card payment -- a

17  bad check was written to the credit card.  If one of those

18  people had asked for a check to be written to their account

19  so they could pay their year-end taxes, they're going to be

20  bouncing a check on the IRS with all the penalties that

21  that involves.

22            Because these people have directed that their

23  money -- that the value of their money in e-gold be moved

24  into the federal banking system so that they can pay their

25  bills and do the things that they would ordinarily do, just

1    as you would do out of your Merrill Lynch account, is not

2    occurring.  This money has been placed beyond their reach,

3    and no other exchange can service them because we can't pay

4    the other exchanges either.  We can't fulfill their

5    OutExchange requests.

6              MS. RIMON:  There are just two other points that

7    I'd like to address.

8              THE MAGISTRATE JUDGE:  Well, what do you say

9    about that?

10             MS. RIMON:  Well --

11             THE MAGISTRATE JUDGE:  There are hundreds of

12   checks bouncing.  And they're going to bounce over the next

13   week and so forth.

14             Now, I must tell you, this was one of my first

15   questions to Mr. Cowan about that, and he told me simply,

16   "That's at the --" as he put it, "the back end, and we'll

17   have to worry about that."

18             MS. RIMON:  And Your Honor --

19             THE MAGISTRATE JUDGE:  What are you doing about

20   that?

21             MS. RIMON:  What we're doing is identifying who

22   those individuals may be and preparing to provide them with

23   notice, and there's a procedure called the expedited

24   settlement process that's available, where we can recognize

25   early on, up front, any valid claims that may be submitted,

1   and we often do.  And we are committed, as Mr. Cowan said,

2   to recognizing those claims.  It's not our goal to have any

3   impact on innocent third parties.  So that's something that

4   we are very involved in now and very committed to doing.

5           But I think the important point also is that as

6   much as there's a procedure to deal with any claims that

7   there may be, that is a finite universe.  And once these

8   are cleared, that ends.

9           There are two other points I'd like to make.  And

10  that's just that Mr. Fuerst referred to the wrong statute

11  or subsection when he referred to 1960 and our view of

12  where they fit.  He referred to 1960(b)(1)(C) in terms of

13  our discussion of funds and how they fit under 1960.

14          THE MAGISTRATE JUDGE:  Yes.

15          MS. RIMON:  And (b)(1)(C), that's a provision

16  that relates to defining a money transmitter as someone who

17  knowingly conducts transactions with funds that are known

18  to be or that are derived from criminal activity.

19          That was not our point.  What we were referring

20  to was 1960(b)(2), which is the next section.  The term

21  "money transmitting" includes transferring funds on behalf

22  of the public by any and all means.  That's an alternative

23  to the one that he quoted, so I think he just simply

24  misunderstood what we were referring to.

25          And I would also like to just add --

1              THE MAGISTRATE JUDGE:  So you're saying that

2      under 1960, you fall within 1960 if you meet the criteria

3      in (1)(A), (B) and (C), and those are "ors."  "Or," you

4      meet the criteria in number 2.  So if you are involved in

5      the transferring of funds on behalf of the public, it

6      doesn't matter whether or not you fall within (B).

7              MS. RIMON:  That's correct.  But also it's our

8      position, and I am happy to do it, I just didn't want to

9      exhaust the Court's time, we do go through, on page 8, it

10     is very strongly our position that Title 31, Section 5330,

11     that the definition there in Subsection (d)(1), which

12     Gold & Silver Reserve cites, but also, and to us more

13     importantly, Subsection (d)(2), which Gold & Silver Reserve

14     failed to include, do cover the business activities OmniPay

15     and the regulations that further define 5330, which are

16     contained in 31 C.F.R., 103.11.  But under all of the

17     definitions contained there, and we listed them

18     exhaustively on pages 8 and 9 of our brief, that there are

19     numerous ways you consider OmniPay to fall within -- I just

20     don't think that you have to get there because 1960 is

21     clear not on its face.

22             THE MAGISTRATE JUDGE:  Thank you.

23             MS. RIMON:  Thank you.

24             THE MAGISTRATE JUDGE:  You have the final word,

25     counsel.

1          MR. FUERST:  Yes.  Just to sharpen the argument

2     there.  1960 makes it unlawful to "conduct, control,

3     manage, supervise, direct or own an unlawful, unlicensed

4     money transmitting business."  Okay?  And the term

5     "unlawful, unlicensed money transmitting business" is

6     defined in (b)(1) --

7          THE MAGISTRATE JUDGE:  I see.

8          MR. FUERST:  -- cap (A), cap (B), cap (C).

9          THE MAGISTRATE JUDGE:  I see.

10          MR. FUERST:  It's not in (2) at all.  (2) talks

11     about money transmitting and helps to define that.  But

12     we're talking about a business.  And so when you get into

13     5330, and the United States directs your attention to

14     (d)(2), again, they are walking away from the definitional

15     provision of the statute.  5330 says, "a money transmitting

16     business."  That's in 5330(a).  And it defines money

17     transmitting business in (d)(1), again, (A), (B) and (C).

18     And (2) is a "money transmitting service," which is not the

19     triggering event, that helps to define what a money

20     transmitting business is, but it's a business that's the

21     issue, the engaging in the unlicensed business.  We're not

22     a 5330 because the conditions are conjunctive there.

23     You've got to meet all three tests.  We clearly don't meet

24     (2) and (3).  The Government doesn't even argue that.

25     1960, we don't meet (1)(A), (B) or (C).

1          THE MAGISTRATE JUDGE:  I understand your point.

2    Okay, I got it.

3          MR. FUERST:  Thank you, Judge.

4          THE MAGISTRATE JUDGE:  Thank you very much.  I'll

5    take this under advisement.  I appreciate, with everything

6    that's involved, the need for expeditious action, and I

7    assure you I will take it as soon as I can.

8          Thank you very much.  Compliment both sides on

9    the excellence of your arguments.  They're particularly

10   well-done.  Thank you very much.  They're very helpful.

11          (End of proceedings as recorded.)

12

13

14

15

16

17

18

19

20

21

22

23

UNITED STATES OF AMERICA )
                         ) Docket No. 05-0664M-01(CR)
DISTRICT OF COLUMBIA     )


        I, PAUL R. CUTLER, do hereby certify that a recording of the foregoing proceedings in the above matter was duplicated from an original recording by the Office of the Clerk, United States District Court for the District of Columbia, and that said duplicate recording of the proceedings was transcribed under my direction to typewritten form.


                         _____
                               PAUL R. CUTLER

        I do hereby certify that the foregoing transcript was typed by me and that said transcript is a true record of the recorded proceedings to the best of my ability.


                         _____
                               BONNIE FURLONG